UNITED STATES of America, Appellee,

v.

Peter BRANDON, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Charles D. GAUVIN, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Marvin GRANOFF, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald R. HAGOPIAN, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Momi A. KUMALAE, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Owen B. LANDMAN, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Norman D. REISCH, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

John WARD, Defendant, Appellant.

Nos. 92–1447 and 92–1465 to 92–1471.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1993.

Decided Jan. 31, 1994.

Dana A. Curhan, by Appointment of the Court, for appellant Peter Brandon; John A. MacFadyen with whom Richard A. Gonnella, was on brief for appellant Charles D. Gauvin; Thomas J. May, with whom Carol A. Fitzsimmons and Johnson, Mee & May, were on brief for appellant Marvin Granoff; Barbara A.H. Smith for appellant Ronald R. Hagopi-

an; William C. Dimitri, by Appointment of the Court, with whom Dimitri & Dimitri, was on brief for appellant Momi A. Kumalae; Donald P. Rothschild, by Appointment of the Court, with whom Tillinghast Collins & Graham, was on brief for appellant Owen B. Landman; Barbara A.H. Smith for appellant Norman D. Reisch; and Catherine C. Czar, by Appointment of the Court, for appellant John Ward.

Craig N. Moore, Assistant United States Attorney, with whom Edwin J. Gale, United States Attorney, and Margaret E. Curran, Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Circuit Judge.

The eight defendants in this case were convicted of conspiracy to commit bank fraud under 18 U.S.C. § 371 and of a varying number of bank fraud counts under 18 U.S.C. § 1344 and § 2 following a jury trial in the district court. They now challenge their convictions and sentences on a wide variety of grounds. For the reasons set forth below, we affirm all of the convictions except for the bank fraud convictions on Counts 24 and 25 against defendant John Ward and the bank fraud convictions on Counts 23 through 26 against defendant Owen Landman, which we reverse.

## I. BACKGROUND

This case involves an alleged scheme to obtain loan financing from a federally insured bank by fraudulently representing the existence of down payments required by the bank from the investors on whose behalf the loans were made. According to the record in this case, viewed in the light most favorable to the government, *United States v. Van Helden*, 920 F.2d 99, 101 (1st Cir.1990), the facts of this scheme are as follows.

On January 1, 1985, defendant Peter Brandon and two others formed a partnership called Dean Street Development ("Dean Street")[1] for the purpose of buying, developing, and selling real estate. Specifically, Brandon planned to buy and renovate motels along the Rhode Island seashore, convert them into condominiums and then sell the individual rooms to investors as condominium units. As part of this plan, the condominium buyers would lease the units back to Dean Street and Dean Street would then manage the properties as motels. Under the "lease-back" agreement with the buyers, Dean Street would apply the income from the operation of the motels to cover the monthly mortgage, tax and insurance costs incurred by the unit buyers. Any shortfalls in operating costs would be made up by Dean Street, leaving the buyers with no monthly costs on their investment.

In addition, buyers would be allowed to use their units for two weeks out of the year. Dean Street would also guaranty them a certain level of profit at sale. Some buyers would receive rebates for each unit they purchased. In short, the buyers would be offered a sweet deal.

To make the deal even sweeter, Brandon planned to arrange all the financing for the buyers. He hoped to obtain 100% financing, that is, loans for the complete purchase price of each unit. With such financing, buyers could invest in the project without putting any money down and consequently obtain that elusive—yet apparently not uncommon for the fast-paced world of 1980s real estate—deal of "something for nothing."

In early 1987, Brandon approached Homeowner's Funding Corporation ("Homeowners"), a mortgage broker that acts as an intermediary between banks and borrowers, to obtain these "end loans" for the buyers. Homeowners' President told Brandon that 100% financing was unavailable for the project. Rather, the best Brandon could hope to find was 80% financing with a 20% down payment required from the buyers. Homeowners subsequently searched for a lender and, after approaching several banks, located

---

1. Several partnerships and corporations related to Dean Street were also involved in this case. Together they are collectively referred to here as "Dean Street." Brandon controlled all of the various entities.

Bay Loan and Investment Bank ("Bay Loan"), a financial institution insured by the Federal Deposit Insurance Corporation. Bay Loan agreed to lend buyers of Dean Street's condominium units up to 80% of the required purchase price.

Homeowners, as well as East–West Financial Corporation ("East West"), the other mortgage broker involved in this case,[2] acted as brokers and servicing agents for Bay Loan. Bay Loan was the actual lender for the Dean Street project and it financed every condominium sale involved in the scheme. By prior agreement, Homeowners and East West provided the original mortgages for the buyers and then sold them to Bay Loan. Homeowners and East West would forward all the loan applications to Bay Loan for approval prior to providing the mortgages for the condominium units.[3] The decision of whether to fund a particular mortgage rested entirely with Bay Loan and Bay Loan set the terms and conditions of each mortgage.

As Bay Loan Vice President of consumer lending, Joseph Gormley, explained to Brandon, the bank required each buyer of a condominium unit to make at least a 20% down payment to the seller, Dean Street, before Bay Loan could fund the loans. Instead of instructing buyers to provide the required down payments, however, Brandon concocted a scheme that permitted buyers to avoid the down payments altogether. As a result, he was able to pursue his original goal of obtaining 100% financing for the condominium project. The scheme was formulated during the spring and summer of 1987 when Brandon had several discussions with, among other people, his attorney, George Marderosian, and co-defendant Norman Reisch, another of Marderosian's clients, concerning ways that the 20% down payment requirement "might be satisfied by alternative methods or might

be avoided." During that period, Brandon also told another person involved in the conspiracy, Claude Limoges, that the down payments would be falsified.

Brandon planned and employed three basic methods of falsifying the down payments. The first method was simply providing money to the various buyers which the buyers would then use to make the down payments to Dean Street. Usually the money came from third-party investors to whom Brandon promised a commission for each down payment they funded. Once the buyer made the down payment to Dean Street, Dean Street would return the money to the investor leaving a paper trail for a down payment that was never actually made. The second method involved obtaining down payment checks from the buyers and promising not to cash them. Copies of these nonnegotiated checks would remain in the loan file to give the appearance that real funds had actually been transferred. The third method was to provide second mortgages to the buyers to fund their down payments and then to discharge those mortgages after the closings.[4]

The first method of avoiding down payments was employed from the outset of the scheme. Co-defendants Charles Gauvin and Marvin Granoff, two clients of Marderosian, agreed with Brandon to purchase some units at the Charlestown Motor Inn. Gauvin and Granoff also agreed to provide down payment funds to other buyers for subsequent unit sales. Brandon promised them $1000 for each unit sold with their down payment funds. In August of 1987, Gauvin, Granoff and a third person each purchased four units. Marderosian conducted the closing and co-defendant Owen Landman, an attorney who shared office space with Marderosian, acted as escrow agent. During the closing, Marderosian recorded the amount of each down

---

**2.** Toward the end of 1987, Brandon became dissatisfied with what he considered the slow pace at which Homeowners was processing the loans and, after a dispute with Homeowners, retained the services of East West to continue the project. East West continued where Homeowners left off with Bay Loan again agreeing to act as the end loan financier.

**3.** The brokers would not provide the financing to the buyers without first getting Bay Loan's agree-

ment to purchase and fund the loans. In fact, Homeowner's line of credit for issuing funds to the buyers specifically prohibited the disbursement of money without a commitment from the ultimate lender, in this case, Bay Loan, to fund the loan.

**4.** Brandon also falsified the loan applications of otherwise unqualified buyers.

payment ($20,500) on the closing statements—also called the HUD settlement sheets—as "amounts paid by or in behalf of borrower." [5]

Gauvin provided the down payment funds for these twelve purchases but no actual payment was ever made; instead, the funds were passed through Dean Street and returned to Gauvin. At the closing, Gauvin delivered twelve separate checks for $20,500 each to Marderosian, drawn on an account that only had a $6000 balance at the time, and Landman deposited the checks in his escrow account. Landman then wrote twelve corresponding checks to Marderosian who in turn wrote checks to Dean Street for identical amounts of $20,500 each. Two days later, Dean Street wrote twelve checks back to Gauvin for the same amounts of $20,500 each and Gauvin deposited the money in the original checking account to cover his initial twelve checks written as down payments to the seller.

In late August and September of 1987, Gauvin provided down payments for the purchase of units at the Charlestown Motor Inn and at the Bayside Motel by Reisch and others. As with the first purchases, Dean Street returned the down payment money within a matter of days and also paid Gauvin an additional $1000 per unit.

In the beginning of 1988, Bay Loan began requiring that down payments be made with certified funds. Gauvin and Granoff agreed to provide buyers with funds so that they could obtain certified checks before the closings. In January and February of 1988, Granoff supplied $470,000 to Marderosian who deposited the funds and began distributing the money to prospective buyers. The original intention was that Dean Street would pay back the money to Granoff a few days after each closing as it had done in the previous transactions. Brandon, however, never returned the money as planned.[6]

With no more money coming from Gauvin and Granoff, Brandon discussed the possibility of funding buyer down payments with Reisch. Reisch had earlier supplied down payment money for a buyer and was reimbursed by Dean Street the next day. Reisch agreed to provide the money, but only if he could wire the money directly to the buyers on a transaction by transaction basis in order to avoid having large amounts outstanding. Funds were wired to buyers on several occasions and the buyers then wrote down payment checks with the money. The checks were either deposited in Landman's escrow account or endorsed directly back over to Reisch. Those funds deposited in escrow were promptly returned to Reisch.

The second method of falsifying down payments, using nonnegotiated checks, was employed less frequently. In October of 1987, co-defendants Ronald Hagopian and John Ward purchased several units at the Bayside Motel using nonnegotiated checks for their down payments. Brandon also enlisted Hagopian and Ward, both real estate brokers, to solicit other buyers for the project. Hagopian and Ward told several of the buyers they had recruited to provide down payment checks which they promised would never be cashed. These buyers proceeded to write checks to Dean Street and those checks were never negotiated.

The third method of falsifying down payments was through dischargeable mortgages. Joseph Gormley at Bay Loan approved a plan for buyers to make only 5% down payments in certified funds with the balance of a required 25% down payment to be satisfied by a second mortgage provided by Dean Street. Dean Street began providing these mortgages to the buyers, but the mortgages were promptly discharged[7] after the closings because Dean Street never actually intended to obligate the buyers. The discharges were accomplished by a "purchase price adjust-

---

5. Throughout the project, the HUD settlement sheets were signed by Brandon and the buyers, including those defendants who purchased units.

6. Brandon did eventually agree to a repayment schedule but, ultimately, none of Granoff's money was ever repaid.

7. Testimony was offered by defendants to the effect that the discharges provided by Dean Street were not legally enforceable and that the buyers are still obligated on the mortgages. We find this possibility irrelevant as the intent was clearly to discharge the mortgages.

ment" given to buyers after the sale to "compensate" them for promised renovations that Dean Street was suddenly unable to make. In reality, the renovations "were never going to happen" in the first place.

At the closings, some of the buyers inquired about the second mortgage documents because Brandon had promised a discharge and the buyers wanted to know when that would take place. The "purchase price adjustment" letters that discharged the mortgages were excluded from the closing documentation so the bank would not see them. During the closings, Landman gestured to several buyers that they should not mention the matter to him. Brandon's assistant at Dean Street, co-defendant Momi Kumalae, did speak to buyers about the discharges and assured them that they would be taken care of. Kumalae also signed many of the discharge letters sent to the buyers.

Despite the sale of almost 200 units, by the fall of 1988, the loan proceeds from Bay Loan's financing of unit purchases was falling well short of Dean Street's expenses and its own debt service. Dean Street quickly fell behind schedule in making the mortgage payments on all the Bay Loan condominium unit loans, and it eventually stopped making any payments by early 1989.

Between August 1987 and October 1988, Dean Street had sold 196 units to 79 different buyers, all financed by Bay Loan in 176 separate loans. The face value of the loans was $18.8 million and Bay Loan actually distributed $17.3 million to Marderosian who passed on about $16.9 million to Dean Street (the balance was retained as fees or was paid to Landman for escrow services). As of the trial, approximately $16.3 million remained outstanding on the loans.

Gormley at Bay Loan, who approved the loans, did not know that down payment funds came from sources other than the buyers, that some down payments were nonnegotiated checks, that second mortgages were being

discharged, or that buyers were being paid to purchase units. Gormley testified that he would not have approved the loans if he had been aware of any of these circumstances.

On February 28, 1991, a federal grand jury sitting in the District of Rhode Island handed down a 27–count indictment charging the eight appellants and four others with defrauding Bay Loan, a federally insured financial institution, of approximately $18 million. Count 1 charged all twelve defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. Counts 2 through 27 charged various defendants with individual acts of bank fraud, under 18 U.S.C. § 1344, based on individual loan transactions executed during the scheme to defraud.[8] Four of the defendants pleaded guilty and did not go to trial. Two of the four, George Marderosian and Claude Limoges, testified for the government.

After a trial in the United States District Court for the District of Rhode Island, the jury found all the defendants guilty of conspiracy and each defendant guilty on multiple counts of bank fraud. Some defendants were acquitted on individual bank fraud charges as discussed below. This appeal followed.

## II. FAILURE OF THE INDICTMENT TO STATE AN OFFENSE

Defendants first argue that the indictment failed to state an offense with respect to the conspiracy count because it did not allege that the United States or one of its agencies was the target of the conspiracy. Count I of the indictment charged defendants with conspiring to commit an offense against the United States in violation of 18 U.S.C. § 371 by executing a scheme to defraud Bay Loan under 18 U.S.C. § 1344. Section 371 makes it a crime to "conspire *either* to commit any offense against the United States, *or* to defraud the United States, or any agency thereof" (emphasis added). The Supreme Court held in *Tanner v. United States,* 483

---

8. One bank fraud count was later dismissed by the government so that 26 total counts remained for trial. Brandon was the only defendant charged in all of the counts.

Each bank fraud count charges one or more of the defendants with facilitating in some way the

fraudulent representation of the required down payment for a specific loan for an individual condominium unit. Although each unit purchase allegedly involved the same fraudulent scheme, only 26 specific executions of the scheme were originally charged.

U.S. 107, 128–132, 107 S.Ct. 2739, 2751–54, 97 L.Ed.2d 90 (1987), that in order to establish a conspiracy to "defraud the United States," under the second clause of § 371, the government must prove that the target of the fraud was the United States or one of its agencies. *Id.* (finding a recipient of federal financial assistance and supervision not to be an agency of the United States for purposes of § 371). The defendants contend that this requirement should be extended to the first clause of § 371 for alleged conspiracies "to commit any offense against the United States."

■ 18 U.S.C. § 371 creates two distinct criminal offenses: conspiracies to commit offenses against the United States and conspiracies to defraud the United States. *See, e.g., United States v. Haga,* 821 F.2d 1036, 1039 (5th Cir.1987). The "any offense" clause of § 371 ("to commit offenses against the United States") is aimed at conspiracies to violate the laws of the United States. It does not refer to a particular victim of a particular crime like the second clause does, but instead applies generally to federal "offenses." The *Tanner* requirement should not be extended to a large area of criminal conspiracies, such as mail and wire fraud, that victimize persons other than the government or its agencies but traditionally have been prosecuted under the "any offense" clause of § 371. *See United States v. Falcone,* 960 F.2d 988, 990 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 292, 121 L.Ed.2d 216 (1992) (citing the reasoning in *United States v. Falcone,* 934 F.2d 1528, 1548–51 (11th Cir.1991) (Tjoflat, C.J., specially concurring, joined by Powell, Assoc. Justice, and Kravitch, J.) to overrule its previous extension of *Tanner* to the "any offense" clause of § 371 in *United States v. Hope,* 861 F.2d 1574 (11th Cir. 1988)); *United States v. Loney,* 959 F.2d 1332, 1338–40 (5th Cir.1992); *United States v. Gibson,* 881 F.2d 318, 321 (6th Cir.1989). We therefore reject the contention that the indictment must assert that the United States or one of its agencies was a target of the alleged conspiracy in this case.

### III. MULTIPLICITY OF THE BANK FRAUD COUNTS

■ Defendants challenge the validity of the indictment for charging twenty-five individual counts of bank fraud under 18 U.S.C. § 1344, when, allegedly, all the counts relate to the single execution of one scheme to defraud Bay Loan. An indictment is multiplicitous and in violation of the Fifth Amendment's Double Jeopardy Clause if it charges a single offense in more than one count. *United States v. Serino,* 835 F.2d 924, 930 (1st Cir.1987). Under the bank fraud statute, 18 U.S.C. § 1344, each execution of a scheme to defraud constitutes a separate indictable offense. *United States v. George,* 986 F.2d 1176, 1179 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993); *United States v. Lemons,* 941 F.2d 309, 317 (5th Cir.1991). The central question for determining multiplicity is "whether a jury could plausibly find that the actions described in the [disputed] counts of the indictment, objectively viewed, constituted separate executions of the [bank fraud] scheme." *United States v. Lilly,* 983 F.2d 300, 303 (1st Cir.1992).

■ A number of factors are relevant in determining whether a single or multiple executions of bank fraud have taken place, including the number of banks, the number of transactions, and the number of movements of money involved in the scheme. *Lilly,* 983 F.2d at 305. Each time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud. *See, e.g., United States v. Barnhart,* 979 F.2d 647, 650–51 (8th Cir.1992); *United States v. Mason,* 902 F.2d 1434, 1436–38 (9th Cir. 1990); *United States v. Poliak,* 823 F.2d 371, 372 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).

■ The government's position is that each transaction in which Bay Loan provided a mortgage (or end loan) to a buyer on the basis of a fraudulent representation of a down payment constitutes a single, independent execution of the scheme to defraud. We think that this position is the correct one when the scheme is viewed properly from an objective standpoint. *See Lilly,* 983 F.2d at 303 (finding that the scheme should be "objectively viewed" to determine multiplicity).

The basic scheme to defraud Bay Loan involved the fraudulent representation of buyers' down payments in order to obtain loan financing from the bank for Dean Street's condominium units. The scheme was not designed to get a set amount, or a preconceived sum, of money. Instead, the scheme functioned by obtaining as many loans as possible depending on the number of buyers Dean Street could recruit to apply for the mortgages. The structure of the scheme was such that individual buyers would be brought in to submit separate loan applications which would be fraudulently prepared and then sent on to Bay Loan for approval and the disbursement of the funds for that individual sale. Bay Loan approved each loan separately based on each individual application and each loan corresponded to an individual piece of property, that is, a separate condominium unit. Objectively viewed, each loan application appears to be a repeated execution of the basic scheme and not simply an additional step or stage of one unitary transaction. Although only one bank was involved in the scheme, there were over 176 separate loans to 79 different buyers involving many separate movements of money from Bay Loan to the mortgage brokers and from the mortgage brokers to Dean Street during the fifteen months in which the scheme was in operation.

The fact that the end loans were sometimes processed in bulk does not alter the essential nature of the scheme. Defendants highlight the fact that, on some occasions, groups of mortgage applications were supplied to Bay Loan together and Bay Loan sometimes wired money to the brokers on a bulk basis. This was usually done, however, as a matter of convenience (such as when several unit purchases closed at the same time) and not as a method to package the financing in a way necessary to accomplish a unified scheme.[9] Arguably, one could view this case as a single execution by Dean Street of a broad scheme to use various buyers as fronts in order to get financing for a unitary motel condominium project. However, we feel it makes more sense to look at each mortgage application as an individual attempt to fraudulently obtain distinct amounts of money from Bay Loan.

This is not, as defendants assert, a situation like the one in *Lilly* where a group of fraudulent mortgages was assigned in a single package of documents to the defrauded bank as security for one sum of money used to buy a single apartment complex. *See id.* at 302–305. In that case, there was one transaction with the defrauded bank which was executed "in order to obtain a single loan, the proceeds of which funded a single real estate purchase." *Id.* at 303. Consequently, we found the charges based on each mortgage to be multiplicitous. The present case is more akin to a check kiting scheme which we characterized in *Lilly* as involving multiple executions of a fraudulent scheme because more than one bank was involved and because, "[m]ore importantly, each check signifies a separate transaction requiring a separate issuance of money or credit on the part of the victimized bank." *Id.* at 304.

Similarly, the other cases cited by defendants that invalidate indictments on grounds of multiplicity involve single loan transactions instead of the multiple and separate loans fraudulently obtained in this case. *See United States v. Saks,* 964 F.2d 1514, 1526 (5th Cir.1992) (single loan transaction for single piece of property); *United States v. Heath,* 970 F.2d 1397, 1401–02 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993) (two loans involved in the case "were integrally related; one could not have succeeded without the other" and both were used to accomplish essentially one integrated real estate transaction); *Lemons,* 941 F.2d at 316–18 (separate payments of loan proceeds to defendant were installments from a single loan transaction involving a

---

**9.** At one point, Brandon could not guaranty clear title to Bay Loan on the condominium units until he sold enough units and obtained a large enough chunk of financing to pay off some of the original mortgages used to buy the motels in the first place. This did necessitate bulk processing of unit mortgages so that blocks of financing could be obtained at one time. The execution of the fraud, however, still remained the submission of individual loan applications as additional buyers were recruited. The block processing of loans did not correspond to one loan for each motel but were instead an amalgamation of individual loans for individual condominium units.

single project). We hold, therefore, that each end loan provided by Bay Loan was the result of a separate fraud upon the bank which the indictment properly charged as an individual bank fraud offense.

## IV. SUFFICIENCY OF THE EVIDENCE

Seven of the eight defendants argue that the evidence introduced at trial was insufficient to support their convictions for bank fraud and conspiracy to commit bank fraud.[10] They argue, with individual variations, that they did not have the requisite knowledge and intent to defraud Bay Loan because they did not know of, or intend to violate, any down payment requirements of the bank. With the few exceptions previously noted, we disagree. Before reviewing the evidence with respect to each defendant, we must first address some issues regarding the substantive offenses charged in this case.

### A. The Offenses

#### 1. Bank Fraud

To prove bank fraud under 18 U.S.C. § 1344,[11] the prosecution must show beyond a reasonable doubt that the defendant (1) engaged in a scheme or artifice to defraud, or made false statements or misrepresentations to obtain money from; (2) a

federally insured financial institution; and (3) did so knowingly. *United States v. Goldblatt*, 813 F.2d 619, 623–24 (3rd Cir.1987); *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir.), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989). The terms "scheme" and "artifice" are defined to include "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *Goldblatt*, 813 F.2d at 624 (citing *United States v. Toney*, 598 F.2d 1349, 1357 n. 12 (5th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980)). "The term 'scheme to defraud,' however, is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *Goldblatt*, 813 F.2d at 624; *see also United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992).

The alleged scheme in this case is the fraudulent representation of down payments that were not actually paid in order to obtain loan financing from Bay Loan. There is little doubt that this scheme took place.[12]

---

**10.** Brandon does not challenge the sufficiency of the evidence against him on appeal. He does argue that certain evidentiary rulings deprived him of a fair trial because he was unable to present his theory of the case and convince the jury of his innocence. This issue is discussed below in Section VII. We note for the record that the evidence against Brandon is not only sufficient but overwhelming.

**11.** At the time when the offenses occurred, 18 U.S.C. § 1344 provided:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a federally chartered or insured financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of a federally chartered or insured financial institution, by means of false or fraudulent pretenses, representations, or promises; [shall be guilty of an offense against the United States].

A technical amendment in 1989 deleted the words "federally chartered or insured" from the section leaving just "financial institution."

Pub.L. No. 101–73, Title IX, § 961(k), Aug. 9, 1989, 103 Stat. 500. Apparently, no substantive change was intended by this amendment as the definition of "financial institution" for all of Title 18, now contained at 18 U.S.C. § 20, still encompasses federally chartered or insured institutions.

**12.** Sufficient evidence exists to indicate Bay Loan provided the loans for the Dean Street project, required down payments for the loans, and approved loans and disbursed money based on the understanding that its lending requirement was satisfied. The evidence also clearly establishes that no down payments were actually made to Dean Street because the payments were either falsified or quickly returned to their source. Defendants did present evidence, mostly testimony by Brandon himself, that Bay Loan knew and approved of the down payment arrangements. However, more than sufficient evidence points to the contrary conclusion including the unequivocal testimony of Bay Loan's Vice President, Gormley, that the bank never knew of nor approved of the skirting of the down payment requirement.

Defendants argue, however, that they did not know of, or participate in, the scheme, and, to the extent that they did participate in activities related to the scheme, such actions were not illegal because the actions were not intended to deceive or defraud Bay Loan. Defendants claim they were either unaware that Bay Loan existed or else unaware that Bay Loan had a down payment requirement that prohibited the various down payment transactions in which they were involved. The central issue on appeal, therefore, is whether defendants possessed the requisite knowledge and intent.

 "To act with the 'intent to defraud' means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." *Cloud*, 872 F.2d at 852 n. 6 (citations omitted) (finding intent to defraud where defendant signed instructions "knowing that the bank could be deceived by materially false statements that appeared on the face of the instructions"); *see also United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir.1992). "It is a well-established principle that fraudulent intent may be established by circumstantial evidence and inferences drawn from all the evidence." *Cloud*, 872 F.2d at 852 n. 6 (citations omitted); *United States v. Celesia*, 945 F.2d 756, 759–60 (4th Cir.1991); *see also United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir.1990) ("Specific intent is established by 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself.'" (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir.1984) (additional internal quotation omitted))).

 Defendants argue that the government must prove that they knew that the victim of their fraud was a federally insured financial institution. We disagree. The status of the victim-institution is not a separate knowledge element of bank fraud under § 1344 but an objective fact that must be established in order for the statute to apply. The government produced evidence, and defendants do not dispute, that Bay Loan is federally insured. This is sufficient to satisfy the requirement under 18 U.S.C. § 1344 that the defrauded bank be a federally insured bank. *See United States v. McClelland*, 868 F.2d 704, 709–11 (5th Cir.1989); *cf. United States v. Thompson*, 811 F.2d 841, 844 (5th Cir.1987) (finding that under 18 U.S.C. § 1014, which criminalizes the making of false statements to a bank, the federal insured status of the victim institution is just a jurisdictional requirement and not a knowledge element of the offense); *United States v. Trice*, 823 F.2d 80, 86–87 (5th Cir.1987) (same).[13]

We decline to adopt defendants' analogy to one of the federal gambling statutes, 18 U.S.C. § 1084(a), which we have previously held requires knowledge of the interstate nature of the wire communication involved in the offense. *United States v. Southard*, 700 F.2d 1, 24–25 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Our holding in that case rested on the fact that the word "knowingly" in the statute could not reasonably refer to anything else except the interstate nature of the communication. *Id.* at 24 (noting one cannot unwittingly or unknowingly make a wire transmission). That

---

13. We find the language of § 1014 sufficiently similar to § 1344 to warrant a similar conclusion about Congress' intent with respect to the knowledge requirement in the bank fraud statute. 18 U.S.C. § 1014 states in pertinent part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation [shall be guilty of an offense against the United States]."

Defendants contend that the use of "knowingly" in this statute differs significantly from its use in § 1344 which prohibits knowingly executing a scheme "to defraud a federally chartered or insured financial institution." We reject this contention. The placement in § 1344 of the words "federally chartered or insured" before the word "institution" instead of similar language being placed after "institution," as in § 1014, simply reflects the fact that federal insurance is separately defined in another subsection and thus there is no need to use the more awkward construction found in § 1014. The different word placement is a distinction without a difference.

is not the case with the bank fraud statute because "knowingly" in § 1344 clearly applies to the execution of a scheme or artifice to defraud. The word "knowingly" is necessary because one can execute a scheme without knowing or understanding that it is fraudulent. In fact, that is what many of the defendants themselves argue in this appeal: that they may have facilitated the false down payments but they did not know it violated the bank's requirements. Therefore, "knowingly" in § 1344 has independent meaning without reference to the federally insured status of the financial institution.

The defendants in this case also argue that the government must prove they knew that the end loans were provided by Bay Loan and not by some other institution, such as Homeowners or East West. In other words, there was no violation of § 1344 because the scheme to defraud was not knowingly targeted at a federally insured financial institution, but instead at the non-federally insured mortgage brokers.

Defendants overstate the government's burden. The specific intent under § 1344 is an intent to defraud a bank, that is, an intent to victimize a bank by means of a fraudulent scheme. *See United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.1992); *United States v. Mason,* 902 F.2d 1434, 1442 (9th Cir.1990). It has been established that the government does not have to show the alleged scheme was directed *solely* toward a particular institution; it is sufficient to show that defendant knowingly executed a fraudulent scheme that exposed a federally insured bank to a risk of loss. *See, e.g., United States v. Barakett,* 994 F.2d 1107, 1110–11 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 701, 126 L.Ed.2d 668 (1994) (fraudulent scheme directed at checking account customers of bank but fraud victimized bank as well); *United States v. Morgenstern,* 933 F.2d 1108, 1114 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992) (direct object of the fraud

was to steal money from third parties with deposits at the defrauded bank).

 We hold that it is also unnecessary for the government to prove that a defendant knows which particular bank will be victimized by his fraud as long as it is established that a defendant knows that *a* financial institution will be defrauded.[14] The bank fraud statute was "designed to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions that are federally created, controlled or insured." S.Rep. No. 225, 98th Cong., 2d Sess. 377 (1983), 1984 U.S.Code Cong. & Admin.News 3182, 3517. In creating the statute, Congress noted that "there is a strong Federal interest in protecting the financial integrity of these institutions, and the legislation in this part would assure a basis for Federal prosecution of those who victimize these banks through fraudulent schemes." *Id.* Thus, Congress intended to criminalize bank frauds that harm federally insured banks, not just bank frauds directed specifically toward federally insured banks. As other courts have noted, "the legislative history supports a broad construction of the statutory language" of the bank fraud statute. *Mason,* 902 F.2d at 1442; *see also Stavroulakis,* 952 F.2d at 694.

 Defendants are essentially seeking to sanitize their fraud by interposing an intermediary or an additional victim between their fraud and the federally insured bank. We reject this attempt to escape the reach of the bank fraud statute. Instead, we find that defendants need not have had the specific intent to defraud Bay Loan so long as they intended to defraud some financial institution. The fact that it should turn out that the financial institution actually defrauded was federally insured is a fortuitous stroke of bad luck for the defendants but does not make it any less of a federal crime. In this case, evidence beyond a reasonable doubt that defendants fraudulently evaded a known

14. We also reject a related claim made by several defendants that the district court had no jurisdiction over their bank fraud counts because the target of the alleged bank fraud—Homeowners or East West as opposed to Bay Loan—was not a federally insured financial institution. Bay Loan

was in fact victimized by defendants' scheme to defraud. In addition, the scheme was designed to obtain funds from Bay Loan in particular by fraudulently avoiding one of Bay Loan's requirements. This more than satisfies the requirements for federal jurisdiction.

down payment requirement, whether thought to be imposed by Homeowners, East West, Bay Loan or some other financing entity, is sufficient to support a bank fraud conviction. Of course, the government must also establish that a federally insured bank, Bay Loan, was victimized or exposed to a risk of loss by the scheme to defraud. *See United States v. Blackmon*, 839 F.2d 900, 906 (2d Cir.1988). This, however, is not seriously disputed in this case.[15]

Concerns about extending the reach of the bank fraud statute into broad new areas of financial activity stem from a misunderstanding of the nature of the statute. Financial transactions are becoming increasingly integrated and complex as more and more financial instruments are securitized and traded on national and global markets. Consequently, the effects of fraudulent actions against one institution are increasingly likely to spill over and detrimentally affect others. As Congress' main concern in § 1344 was to provide jurisdiction for fraudulent schemes that harmed federally chartered or insured institutions, the increased risks to the institutions should be matched by increased coverage of the statute. We are not federalizing criminal transactions previously covered only

by state law so much as recognizing that those criminal transactions are becoming more federal in nature.[16]

An additional argument defendants make is that the government must prove defendants knew that Bay Loan's down payment requirement specifically prohibited the funding of buyers' down payments by someone other than the buyer. Defendants claim that they thought the funding of buyer down payments was just some complex financial arrangement, "supplemental financing" or required paperwork, and they did not know the funding was designed to defraud the bank.

This misrepresents the nature of the fraud. Although Bay Loan did in fact prohibit third party funding of down payments, the key misrepresentation in this case was that the required down payments were being paid when they actually were not. Bay Loan required the buyers to make down payments to the seller, Dean Street, and the existence of the payments was represented to the bank on the closing settlement sheets. In reality, the payments were not being made, either because no funds were actually transferred or because the funds were returned by Dean Street to their source.[17] Therefore, the gov-

---

**15.** The down payment scheme victimized Bay Loan because it devalued the mortgages that the bank was providing. Down payments on a loan decrease the risk of default or nonrepayment by increasing the equity participation of the borrower and giving the borrower a larger stake in the venture. The down payments consequently have value to the lender bank and the failure to make them deprives the bank of this value. *Cf. Mason*, 902 F.2d at 1441–43 (finding intent to commit bank fraud where bank exposed to risk of loss through defendants' concealment from the bank that its customers were purchasing prostitution services and consequently were a greater credit risk to the bank which was processing the customers' credit card purchases from defendants' escort service).

The fact that buyers were required to make their down payments to the seller, Dean Street, does not mitigate the risk of loss to Bay Loan from the down payment scheme. There would still be a higher risk of default and the absence of equity participation regardless of who was receiving, or failing to receive, the down payments. In addition, the value of the condominiums, the bank's collateral, becomes an issue where the bank, thinking it is only providing 80% of the purchase price, is actually lending 100% of the sale price. Ultimately, Bay Loan refused to pro-

vide 100% financing and explicitly required a down payment; the payment became a negotiated term of the mortgage contract and thus had some value to Bay Loan.

**16.** We do not address whether any scheme to defraud, regardless of its intended victim, can be prosecuted under the bank fraud statute as long as it has some detrimental effect on a federally insured bank. In this case at least, the government did prove the scheme was intended to defraud a financial institution: Homeowners or East West, if not Bay Loan itself.

We also do not address possible statutory or jurisdictional limitations on the remoteness or foreseeability of the harm or the risk of loss to federally insured financial institutions beyond which § 1344 will no longer apply. We simply note that this case presents a situation of direct harm to Bay Loan resulting from a scheme specifically designed to fraudulently avoid the requirements of that federally insured bank in order to obtain funds originating directly from Bay Loan.

**17.** In those cases where Dean Street failed to repay down payment funds as promised, the intention was still to do so and to execute the same fraud as was executed on the other unit sales.

ernment need only prove that defendants knew a down payment was required and that no real down payments were actually made. It need not establish that defendants knew all of the specifics of the down payment requirement such as restrictions on third party funding.

In sum, to prove defendants knowingly engaged in the fraud, the government must establish that each defendant knew that some financial institution was lending the money for the motel-condominium project, knew that a down payment was required for these loans, knew that a scheme of one sort or another existed to make it appear that the down payments were being made when in fact they were not, and finally, that each defendant willfully participated in that scheme.

### 2. Conspiracy

Each defendant contests the sufficiency of the evidence of his or her knowledge of the conspiracy to defraud Bay Loan and his or her level of participation in that agreed upon scheme. To prove conspiracy, the government must show the existence of an agreement between defendant and another to commit a crime,[18] that each defendant knew of the agreement, and that each defendant voluntarily participated in the conspiracy through conduct that was interdependent with the actions of the other conspirators. *United States v. Gómez–Pabón*, 911 F.2d 847, 852–53 (1st Cir.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991); *United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). The defendants must have both the intent to agree to participate in the conspiracy and an intent to commit the underlying substantive offense. *Gómez–Pabón*, 911 F.2d at 853; *United States v. Drougas*, 748 F.2d 8, 15 (1st

Cir.1984). The government, however, need not prove that each defendant knew all of the details and members, or participated in all of the objectives, of the conspiracy as long as it can show knowledge of the basic agreement. *Gómez–Pabón*, 911 F.2d at 853; *United States v. Marsh*, 747 F.2d 7, 13 (1st Cir.1984). Such proof of knowledge and intent "may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes." *Gómez–Pabón*, 911 F.2d at 853.

The government must also establish defendants' participation in the conspiracy with the intent to further the aims of the conspiracy. *Direct Sales Co. v. United States*, 319 U.S. 703, 712, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943). Once a conspiracy is established, as well as defendant's intent to further it, any connection between the defendant and the conspiracy, even a slight one, will be sufficient to establish knowing participation. *Marsh*, 747 F.2d at 13.

In this case, the government must prove that the defendants knew there was an agreement to fraudulently represent down payments in order to get loans from Bay Loan and that they willfully participated in this scheme by taking some overt action with the intent to further the scheme's objective. Thus, the evidence must be sufficient to establish the intent to commit bank fraud as discussed above and, in addition, must also establish an intent to commit the fraud in conjunction with the broader conspiratorial agreement.

### B. The Case Against Each Defendant

Our task on review of the verdicts is to examine the evidence in its entirety in the light most favorable to the government to determine whether a rational trier of fact could have found the essential elements of

---

18. To the extent that the existence of a conspiracy is at issue, the evidence is overwhelming to support the convictions. A conspiracy is an agreement to commit a crime and may be inferred from the circumstances. *United States v. Concemi*, 957 F.2d 942, 950 (1st Cir.1992). Brandon planned and executed a complex scheme to defraud Bay Loan that required the cooperation of investors, brokers, and other

agents involved in facilitating the transactions. Brandon told several co-conspirators of his plans to falsify down payments, including Marderosian, Reisch, Gauvin, Granoff, Hagopian, and Ward. The evidence indicates these defendants agreed to become involved in the conspiracy by performing such critical tasks as drawing up mortgage discharges, wiring money, and providing down payment checks that would not be used.

the crime beyond a reasonable doubt. The government receives the benefit of all legitimate and favorable inferences, and it can prove its case by circumstantial evidence without having to exclude every reasonable hypothesis of innocence. *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir.1992); *United States v. Boldt*, 929 F.2d 35, 39 (1st Cir.1991); *United States v. Van Helden*, 920 F.2d 99, 101 (1st Cir.1990). Below, we review each defendant's case individually.

### 1. Marvin Granoff

Granoff was convicted of conspiracy and two counts of bank fraud in connection with his purchase of units on one occasion and with his funding of buyer down payments on another occasion. Granoff argues that the evidence in this case is insufficient to show that he was anything more than an innocent investor duped by his lawyer, Marderosian, into providing money for a project he really did not know anything about. Although the evidence against Marvin Granoff reveals a more circumscribed role than some of the other defendants, we are not prepared to overturn the jury's guilty verdict

on either the conspiracy charge or on the two counts of bank fraud.

Sufficient evidence supports the jury's conclusion that Granoff knew Bay Loan was funding Dean Street's condominium project, that he knew down payments were required from the buyers and that he knowingly participated in a scheme to deceive the bank into thinking the requirement was satisfied. To begin with, Granoff bought four units on one occasion and provided down payment funds on another occasion. Both times Bay Loan financed the purchases without knowing the required down payments were not actually made. Prior to each of these transactions, Granoff attended a series of meetings with Brandon concerning the motel condominium scheme. Brandon told Granoff that down payments were required and that he needed Granoff to provide money for the down payments of other buyers.[19] Granoff agreed to do so.[20]

For Granoff's purchase of units at the Charlestown Inn in August of 1987, his partner, Gauvin, provided down payments to Dean Street on Granoff's behalf in the form of checks that were not backed by sufficient funds. Copies of the checks were included in

**19.** Specifically, Marderosian testified that Brandon told Gauvin and Granoff in the summer of 1987 that "Homeowners required a twenty-five percent down payment and while that down payment would not be required of Mr. Gauvin and Mr. Granoff, he did have the problem of the down payment with subsequent purchasers and he asked Mr. Gauvin and Mr. Granoff for their assistance in meeting that problem." Despite the offer to "waive" Gauvin and Granoff's down payments, checks representing down payments were required for their purchases.

In another meeting, Brandon asked Gauvin and Granoff if they were "willing to provide the down payment money for other purchasers" and they agreed to do so. Marderosian also testified that Brandon told Granoff at a meeting in January of 1988 that he needed someone to provide funding for the certified down payment funds required from unit buyers. Brandon asked whether Gauvin and Granoff were "interested in providing those certified funds" and they agreed.

**20.** Marderosian testified that Granoff agreed on several different occasions to participate in Brandon's scheme and referred several times to the "agreement Mr. Gauvin and Mr. Granoff made to provide Mr. Brandon with monies for the down payments." Despite this, Granoff argues that Marderosian's testimony indicates Granoff said

little or nothing at the various meetings with Brandon and this is insufficient to establish Granoff agreed to participate in the conspiracy. The fact that Granoff provided $470,000 that was used for down payments following the meetings with Brandon in which the agreement was discussed, however, is sufficient to support the conclusion that Granoff in fact did agree and did participate in the conspiracy.

Furthermore, Granoff's involvement in the conspiracy was more than just the provision of goods and services to an operation that he knew might use the funds illegally. *See Direct Sales Co. v. United States*, 319 U.S. 703, 711, 713, 63 S.Ct. 1265, 1269, 1270, 87 L.Ed. 1674 (1943); *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). The evidence, as we discuss below, indicates that Granoff provided money specifically for the purpose of funding down payments he knew would be falsified and was promised $1000 per unit for his efforts. Granoff's provision of down payment funds was a specialized transaction without loan documents or other paperwork and did not constitute merely the provision of goods or services to the conspiracy. Overall, the evidence is more than adequate to support the finding that Granoff adopted the goals of the conspiracy as his own and provided the down payment funds to further the conspiracy.

the closing files. The "payments" were returned to Gauvin two days later when Dean Street wrote identical checks back to Gauvin which Gauvin deposited in his account to cover the original down payment checks. The fact that Gauvin's checks, totalling $246,-000, were drawn on an account with only $6000 at the time when they were written indicates that there was no intent on Gauvin's part to make an actual down payment in the first place.[21]

Granoff likewise provided down payment funds for other buyers and the evidence indicates he did this knowing and expecting that the money would be returned to him after the closing. Granoff provided $470,000 for down payments on the Atlantic Inn–Westerly units in the form of two checks, one for $270,000 from Marvin Granoff Real Estate and another for $200,000 from Granoff's Eastern Wire Products Co. In turn, Brandon promised to pay Granoff $1000 for each unit sold using Granoff's down payment money.

As it turns out, Granoff was never paid back, but the evidence shows that Granoff expected and intended for this money to be promptly returned to him after the closings. A recycling arrangement had been used earlier for Granoff's own purchase, and for subsequent purchases funded by Gauvin, under the initial agreement between Granoff, Gauvin, and Brandon. More importantly, about two weeks after the first closings involving Granoff's $470,000, Gauvin sent a letter to Marderosian, on Manchester Associates[22] letterhead, complaining that the transaction involving the $470,000 was taking too long.

The letter stated that the transaction involving Granoff's $470,000 "was to take at most two to three days." Marderosian also testified that on a different occasion, Gauvin told Marderosian that Gauvin and Granoff "can make money without putting up any money." In addition, there was no promissory note or other formal documentation to indicate that the $470,000 was normal loan financing.[23] Consequently, Granoff knew that his money was used to create the appearance that down payments were being paid when in fact they were not; they were being falsified.

The arrangement of rapidly recycling "down payment" funds through Dean Street meant that, in reality, no down payments were being made at all. A paper trail was left in the closing files indicating that the buyer had made a down payment to the seller, Dean Street, when, in fact, the seller just returned the money to its source, effectively rendering that paper trail fraudulent. Bay Loan's down payment requirement was thus avoided without the bank's knowledge. As a knowing participant in this recycling scheme, Granoff possessed the necessary intent to defraud and the requisite level of involvement in the larger conspiracy to be found guilty of the offenses charged.

Although not essential for upholding Granoff's conviction, we also find that the evidence is sufficient to show that Granoff knew Bay Loan was loaning the money for the condominium units. Granoff bought four units financed by Bay Loan and he put up nearly half a million dollars to provide down payment funds for other units to be pur-

---

**21.** Granoff argues that with respect to Count 2, charging him with bank fraud in connection with his purchase of a unit at the Charlestown Motor Inn, the requisite knowledge element was not established. Brandon had told Granoff that the down payment would be waived for his purchase and there was nothing, Granoff claims, in the closing procedure sufficient to support the conclusion that he knew his purchase took place under fraudulent pretenses. On the contrary, even if we disregard the reasonable possibility that Granoff's partner, Gauvin, told Granoff all about the complex recycling transaction Gauvin undertook with the checks used for Granoff's down payment, the fact that Granoff signed the HUD settlement sheets establishes a sufficient basis to conclude Granoff knew he was representing the existence of down payments that he

was not actually paying. The HUD settlement sheet for Granoff's purchases clearly indicated that a $20,500 down payment was being paid by the buyer. If indeed Granoff was under the impression, up to that point, that the down payment had been "waived," the $20,500 figure on the closing documents must have tipped him off that something suspicious was going on.

**22.** Manchester Associates was a partnership formed by and consisting of Gauvin and Granoff.

**23.** Gauvin and Granoff documented a previous loan to Brandon for the smaller sum of $200,000 indicating that if they really intended the money to be a loan instead of a tool to show down payments through a recycling transaction, they would have documented it.

chased with Bay Loan financing. Home-owners furnished a letter at the closings including the closing on Granoff's purchases, which Granoff attended, stating that Home-owners had "transferred all of its rights and interests" in the mortgage to Bay Loan.[24] Granoff had occasion to see the letter and it is not unreasonably to assume he also read it.

Granoff also attended a number of planning meetings with Brandon in which plans for closing on various units, the funding of down payments, and other details of the scheme were discussed. The evidence also indicates Granoff was continually kept abreast of various details of Brandon's scheme; details, one could infer, that included the source of the financing. In the last half of 1987, Granoff and Gauvin formed a partnership called Manchester Associates for the purpose of real estate investment. On behalf of Manchester Associates, Gauvin met several times with Brandon who discussed his overall plans to close on over 400 motel units as well as the schedule for those closings. Letters referencing these meetings were written on Manchester letterhead and one could reasonably infer that Gauvin related the substance of the meetings to his partner Granoff.[25] One such letter from Gauvin states that "it would seem that the lending institutions will be in a position to begin closing." As Homeowners and Bay Loan were the only institutions involved at the time the letter was written, the plural reference to "institutions" indicates that Gauvin and his partner, Granoff, were aware not only of Homeowners but of Bay Loan as well.

In sum, the evidence indicates that Granoff was aware, on a fairly detailed level, of a large real estate scheme whose only source of funding happened to be Bay Loan. With substantial sums of his own money at stake in this extensive project, Granoff was likely to become aware at some point of the source of money behind it all. It is not unreasonable to conclude, therefore, that Granoff knew of Bay Loan's involvement in the project.

Furthermore, the fact that Bay Loan was providing the financing was known to several others who, like Granoff, were involved in buying and investing in the units. Brandon testified that he was "completely open" about, and "made no secret" of, Bay Loan's involvement. Although Brandon testified that he generally told people outside Dean Street that the lender was Homeowners and not Bay Loan, he also testified that he told Hagopian, Ward, Reisch, and Limoges about Bay Loan's involvement. These people, like Granoff, bought units or provided down payment funds and were not Dean Street employees. Even an investor named Michael Parvin, who bought only one unit, testified that he knew Bay Loan was involved. It is not unreasonable, therefore, for a jury to conclude that Granoff discovered this fact as well.

Granoff challenges any inferences of criminal knowledge or intent drawn from the pool of circumstantial evidence as impermissibly based merely on Granoff's association with his co-defendants. He claims that amidst the fast-paced wheeling and dealing of the 1980s real estate market, investors did not have the ability to know all the details and purposes behind every one of their transactions. It was common for investors to entrust their money to developers and lawyers without learning any of the specifics of the various projects in which they were involved. Details such as the exact nature of a bank's down payment requirement were not, Granoff implies, important enough to be discussed between a developer and an investor.

---

**24.** There is some dispute whether this letter, which was not signed by the parties, was included among the documents at the closings. Homeowners' Vice President, Gregory Cambio, testified that the letter "was part of the closing package" but also testified that it may have been sent after the closing. The trial exhibits containing the loan files for each of Granoff's purchases do contain the letter which is dated on the same date as the closing. However, the file contains both closing documents, signed by Granoff, as well as other documents that may or may not have been at the closing. The letter, therefore, is not dispositive of Granoff's knowledge, but does provide some evidence of knowledge that can be considered in conjunction with the other circumstantial evidence.

**25.** For example, Granoff was cc'd on a letter to Dean Street that referenced plans to close on 107 units and discussed the repayment of Granoff's $470,000.

Add to these circumstances the unscrupulous and deceptive acts of Brandon and Marderosian, who allegedly got Granoff into this whole mess, and Granoff contends that we cannot help but conclude he was lied to about the true nature of the project.

While it may be true that the typical real estate investor in the 1980s would readily put up hundreds of thousands of dollars for "down payment funds," expect the money back in a few days, and still not suspect he is defrauding a bank, we are certainly not prepared, given the facts discussed above, to preclude a jury from concluding otherwise. The government need not disprove every reasonable hypothesis of innocence, provided the record in its entirety supports the jury's verdict. *United States v. Ortiz*, 966 F.2d 707, 714 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993). In this case, the record does provide the requisite support. Therefore, we affirm Granoff's convictions.

### 2. Charles Gauvin

■ Gauvin was convicted of conspiracy and five counts of bank fraud in connection with his purchase of several units and his funding of buyer down payments. Gauvin was Granoff's business partner and the more active of the two in their dealings with Dean Street. According to the record, he knew at least as much as Granoff, and most likely more, about the scheme to defraud Bay Loan. Gauvin also participated to a greater extent in the scheme than Granoff did. Consequently, there is no need to discuss at length the evidence sufficient to support his conviction.

The jury could have found that Gauvin knew Bay Loan was providing loans for the condominium project and requiring down payments for these loans based on the evidence of the several meetings Gauvin attended and correspondence that he exchanged with Brandon discussing the condominium projects and his agreement with Brandon to provide buyers with down payment funds that were required for the financing of the units. The jury could infer that Gauvin knew the down payments were not in fact being paid in violation of the bank's requirement,

and that Gauvin willfully participated in the scheme to accomplish this fraud, based on the evidence that Gauvin: (1) delivered to Dean Street twelve down payment checks backed by insufficient funds for the Charlestown closings in August of 1987 and received twelve equivalent checks back from Dean Street two days later which he used to cover his original checks; (2) provided down payment money for Reisch and others which was returned to him within a matter of days; (3) commented to Marderosian that the down payment checks he was providing "did not have to be backed by good funds because the timing was so quick" and that he and Granoff could "make money without putting up any money;" and (4) delivered Granoff's $470,000 in down payment funds to Dean Street and wrote in a subsequent letter to Brandon that he expected the transaction involving those funds "to take at most two to three days."

Gauvin argues that the evidence of his activities clearly indicates a lawful intent in his writing the checks to Dean Street. As he testified at trial, Gauvin thought he was simply lending money to Dean Street for its condominium project and he had no intention that his money be used for fraudulent purposes. Evidence in the record indicates that "supplemental financing," similar to what Gauvin thought he was providing to Dean Street, was a standard practice in the industry. Gauvin also testified that he was "surprised" to see his first twelve checks come back so quickly. But Gauvin was not so surprised, apparently, so as to be tipped off that anything illegitimate was going on because such rapid turn around of loans was also a standard practice during the real estate boom of the 1980s. Gauvin suggests that maybe Dean Street was packaging the secondary financing and selling it off at a profit, thus removing Gauvin's participation as a lender fairly quickly.

Maybe, but then again, maybe not. The jury considered Gauvin's arguments and decided that the evidence proved Gauvin knew what was really happening at Dean Street. Our job on appeal is to measure the sufficiency of that evidence and not to search for every logical or rational conclusion that can be drawn. *Ortiz,* 966 F.2d at 714. Gauvin

was told several times that funds were needed to make down payments for buyers. We find it rather difficult, therefore, to believe Gauvin thought he was legitimately loaning money for down payments when the recipient of the payments was giving the money right back to the lender. If Gauvin loaned money to a friend to buy a car and then had his loan paid off by the car dealership, we might wonder about his characterization of the transaction as normal financing. In the present case, the suspicious nature of the transactions, combined with evidence of the underlying scheme to defraud and an agreement between Gauvin and the scheme's mastermind to contribute funds to the scheme, is more than ample to support the jury's verdict.

### 3. Norman Reisch

Reisch was convicted of conspiracy and seven counts of bank fraud. The evidence against Reisch indicates that he knew Bay Loan was financing the condominium units, that he knew down payments were required for the condominium loans and that he knowingly participated in a scheme to recycle funds through buyers to make it look like these down payments were actually being made. Reisch had "at least a dozen" discussions with Brandon and Marderosian about the 20% down payment requirement and ways that the "requirement might be satisfied by alternative methods or might be avoided," including the use of second mortgages and loaning the down payment money to the buyers.

Proof of Reisch's knowing participation in the conspiracy is as follows. Reisch bought four Charlestown units for which Gauvin provided the down payment funds. At the same time, Reisch provided another buyer with down payment money for three other units. Dean Street returned the money to Reisch the next day. Reisch later agreed with Brandon to wire money for down payments directly into buyers' accounts. After each closing that utilized Reisch's wired funds, the down payment money was returned to Reisch. On some occasions, the buyers' checks to Dean Street, which were funded by Reisch, were endorsed directly back over to

Reisch. Reisch once remarked about this arrangement "we would just have to keep bringing the funds back and rolling them to wire more funds out for the projects."

As for Reisch's knowledge of Bay Loan, Brandon testified that it was "very probable" that he told Reisch about Bay Loan's involvement in the project during a conversation in the summer of 1988. The jury could reasonably conclude that Reisch had knowledge of Bay Loan even before this conversation. Reisch's contact with Brandon and his involvement in the down payment scheme was more significant than that of Granoff. Because we found sufficient evidence to support the conclusion that Granoff had knowledge of Bay Loan, we think that, for the reasons discussed above, there is also sufficient evidence against Reisch.

Like Gauvin and Granoff, Reisch argues that he was just making loans that he thought were completely legal. Like Gauvin and Granoff, we find this argument unconvincing, especially given Reisch's greater involvement in the scheme. We reject, moreover, Reisch's application of the holding in *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.1940) (holding the mere delivery of goods or services to a conspiracy does not constitute membership in the conspiracy), to this case. Reisch's conduct amounted to more than a mere delivery of loans to a conspiracy. The evidence indicated that Reisch was involved in the planning of the down payment scheme and that he played a key role in furthering the success of a conspiracy that was starved for new funds before he began supplying them. In particular, Reisch provided a specific loan arrangement (involving a complex system of wired funds) especially tailored to falsifying the down payments. Reisch's actions thus were not limited to the mere provision of lending services but instead were strong evidence of an intent to further the conspiracy.

### 4. Ronald Hagopian

Hagopian was convicted of conspiracy and six counts of bank fraud for his role as a broker for Dean Street who solicited

buyers and facilitated their purchases.[26] The evidence against Hagopian more than adequately establishes his knowledge of Bay Loan's down payment requirement and his knowing participation in various schemes to fraudulently represent the existence of those down payments. To begin with, Brandon testified that he told Hagopian about "his relationship" with Bay Loan, which establishes Hagopian's knowledge that Bay Loan was providing the financing. Hagopian knew a down payment was required for the units by virtue of the fact that he provided a down payment check for his own purchase, and he discussed down payments with some of the buyers he recruited.[27]

Hagopian also knew about and participated in the scheme to falsify the existence of the down payments. Hagopian purchased several condominium units and wrote a corresponding down payment check that Dean Street never negotiated. Hagopian told the buyers he recruited that they needed to write checks to Dean Street for the purchases of their units but that the checks would either not be used or would be covered by Dean Street itself.[28] Hagopian also told some buyers that they would have second mortgages to cover part of their down payment but these mortgages would later be discharged. All of these schemes were actually executed with many of the buyers Hagopian solicited. Sometimes Hagopian returned voided or nonnegotiated down payment checks back to the buyers. Hagopian also told buyers they would be paid for each unit they bought and he usually provided this rebate money to the buyers he had solicited after the closings.

Hagopian adds a new twist to the familiar refrain that he thought he was participating in a perfectly legal real estate project. He claims that the fact he openly solicited buyers for a "no money down" investment opportunity proves that he had no knowledge that Brandon's down payment scheme defrauded the bank. Hagopian placed public advertisements for the condominiums that explicitly promised "no money down." Hagopian contends that because Dean Street took care of all the financing, his job was limited to soliciting buyers for a type of real estate investment that was allegedly common at that time and not in any way suspicious.[29]

The evidence clearly supports the jury's conclusion that Hagopian did more than innocently broker deals for Dean Street. Hagopian told buyers of his "no money down" investment opportunity to provide down payment checks that would not be cashed and to sign mortgages that would be discharged. His "openness" in advertising no money down investments simply shows he was actively soliciting buyers to further the scheme. The scheme relied on new faces to serve as frontmen for the individual bank loans and Hagopian's actions were an integral part of furthering the scheme's success.

Hagopian was not open about the fact that "no money down" meant providing false paperwork to the bank so that it would think down payments were actually being made. Regardless of whether 100% financing was

---

**26.** The court entered a mid-trial judgment of acquittal for Hagopian on one count of bank fraud. Hagopian was also found not guilty by the jury on two counts of bank fraud.

**27.** In addition, Hagopian's business partner, John Ward, who rounded up buyers with Hagopian, told one of these buyers to give Ward a check "for the down payment that was required."

**28.** In addition, Hagopian was present during several meetings with Brandon including one where Brandon told a buyer that there were no down payments. Hagopian also told this to the buyer. The buyer eventually did produce a down payment check for his purchase and the check was never negotiated. Hagopian was subsequently asked about that check by the buyer who expected it to be returned to him and was concerned it might actually be cashed. Hagopian said he would look into it.

**29.** Hagopian makes a related argument that his conduct did not further the conspiracy to a significant degree and that there was not sufficient interdependence between Hagopian and the other conspirators to establish that he joined the conspiracy as required. *United States v. Evans* 970 F.2d 663, 670 (10th Cir.1992); *United States v. Horn*, 946 F.2d 738, 740–41 (10th Cir.1991). All that is required is that the alleged conspirator facilitate the endeavors of other alleged co-conspirators or facilitate the venture as a whole. *See Evans*, 970 F.2d at 670; *Horn* 946 F.2d at 740–41. The government has more than met this burden.

customary at the time and thus not suspicious, the fake down payments and fake second mortgages were certainly not customary (or if customary in the 1980s, still illegal), and the jury was warranted in concluding that Hagopian knew this. Finally, the jury could reasonably infer that the public advertising was just a necessary, and minor, risk taken by Hagopian to attract new buyers and not particularly convincing evidence of his innocence.

### 5. John Ward

Ward was convicted of conspiracy and six counts of bank fraud for purchasing a unit and for soliciting and facilitating unit sales.[30] The evidence against Ward, at least in terms of knowledge and intent, is essentially the same as that against his partner, Hagopian, and the two played essentially the same role in the conspiracy. Brandon testified that he told Ward about "his relationship" with Bay Loan. Ward also knew that down payments were required as he was involved in many of the same discussions with potential buyers that Hagopian was involved in. Specifically, Ward told one buyer to give him a check "for the down payment that was required."

Ward knew down payments were not actually being made as his own down payment was not negotiated and he told one buyer, whose down payment funds were to be wired into that buyer's account, that the down payment check would be cashed the same day so that the people wiring the funds "got their money back."

We reject Ward's assertion that he thought Bay Loan approved all of the various down payment shenanigans in which he was involved. Ward contends that the down payment arrangement that he was aware of was simply a paperwork requirement and not a "real" requirement; that is, Ward only knew that some sort of paper representing down payments had to exist but thought no real funds were actually required from the buyers. We suppose Ward's contention is within the realm of the possible. However, the jury looked at the intricate down payment arrangements and the way Ward explained them to the buyers and found, quite reasonably we think, that Ward knew his actions were a "departure from fundamental honesty." *Goldblatt*, 813 F.2d at 624. The common sense understanding of a down payment is the transfer of actual funds from the buyer to the seller or financier. With this in mind, it is more than reasonable for a jury to find that once a defendant learned of the structure of the down payment arrangement used in this case, with no real down payments changing hands, the defendant would be tipped off to the fact that a fraudulent transaction was contemplated. Even if we assume Brandon lied to Ward and told him that Bay Loan directed Dean Street to arrange for paper, as opposed to real, down payments, the evidence was sufficient to support a finding that Ward knew he was engaging in a sham transaction.

The evidence is also sufficient to prove Ward's willful participation in the overall conspiracy and Ward's execution of the bank fraud scheme charged in Counts 9, 15, 18, and 19.[31] However, the evidence is not sufficient to show that Ward took any actions that would constitute the engagement in bank fraud set forth in Counts 24 and 25 of the redacted indictment.[32] Consequently we uphold the convictions on the former counts and reverse the verdict against Ward on the latter two counts.

■ As stated in Count 9, Ward bought a condominium unit at the Bayside Motel in October of 1987. The down payment check he provided for the sale was never negotiated. This is sufficient, given his knowledge discussed above, to support the conclusion

---

**30.** The district court entered a mid-trial judgment of acquittal in favor of Ward on one count of bank fraud. The jury found Ward not guilty on two additional counts of bank fraud.

**31.** Count 9 charges bank fraud in connection with Ward's purchase of a unit at the Bayside Motel. Counts 15, 18 and 19 charge bank fraud in relation to unit purchases at the Sandpiper

Motel and the Hillside Motel that were facilitated by John Ward and others.

**32.** Counts 24 and 25 charged Ward and four other defendants with defrauding Bay Loan by obtaining an end loan for the purchases of units at the Sandcastle Motel by Bruce Schulbaum and John Mills, III.

that Ward never intended to provide real funds for the down payment but just paperwork to deceive the bank. Ward's conviction for bank fraud on Count 9 is thus upheld.

■ The evidence is also sufficient to support the conviction on Counts 15, 18 and 19 which each charged Ward with bank fraud for facilitating the sale of a separate condominium unit. Ward helped to solicit the buyers involved in the transactions for these counts by telling them that no down payments were required. He directed one of these buyers to provide a down payment check that would be funded by someone else and then cashed so that the funds could be returned. Ward provided the buyers in Counts 15 and 18 with the rebates they were promised for purchasing units. For the transaction in Count 19, the evidence indicates that Ward was the intermediary for the funds wired by Brandon to cover the buyer's down payment. Brandon's wire transfer was directed to the buyer's insurance company to the attention of "John Ward." Thus, we uphold Ward's convictions for conspiracy and on Counts 15, 18 and 19.

■ The evidence is not sufficient, however, to show that Ward engaged in bank fraud with respect to the transactions in Counts 24 and 25. Although Ward was present at the closings and several of the meetings where down payment arrangements were discussed for the sales in Counts 24 and 25, there is no evidence that Ward said anything to these particular buyers or did anything to otherwise facilitate their purchases.[33] Ward did not provide the buyers in Counts 24 and 25 with rebates as an incentive to buy nor did he direct these buyers to falsify their

down payments.[34] As such, Ward neither executed nor aided the execution of the scheme to defraud in these two instances. Because we see no evidence in the record to support any reasonable finding by the jury that Ward played a role in obtaining the loans in Counts 24 and 25, we reverse his convictions for these two counts.

### 6. Owen Landman

■ Landman was convicted of conspiracy and six counts of bank fraud in connection with his facilitation of down payment arrangements for Dean Street.[35] Ample evidence exists to support the finding that Landman knew a down payment requirement existed and that he knew about the various fraudulent methods used to avoid that requirement. As in Ward's case, however, the evidence is not sufficient to show Landman participated in the execution of a scheme to defraud for four out of the six bank fraud counts.

Landman acted as an escrow agent for a number of the condominium closings and one of his main responsibilities was receiving down payments from buyers and transferring them to the seller, Dean Street. Marderosian testified that he told Landman that Gauvin and Granoff would be funding down payments for the initial purchasers and Landman should hold that down payment money. Landman knew that the down payment funds were being returned to whoever provided them as Landman himself delivered the money back to its source on several occasions.[36]

Landman also knew about the fraudulent second mortgages that were supposed to cover part of the down payment. He knew the

---

33. Ward was involved in running the newspaper advertisement that originally attracted the buyers to the Dean Street project. However, that act was not necessarily directed toward these specific fraud counts and, while contributing to the fraud, was not alone sufficient to constitute an affirmative act of facilitation of the fraudulent loan transactions charged in Counts 24 and 25.

34. We note that Hagopian, who was also convicted on these two charges and whose conviction we are upholding, did actively solicit the buyers, discuss down payment arrangements with them (such as dischargeable mortgages), and provide rebate money after their purchases.

35. The jury found Landman not guilty on two counts of bank fraud.

36. Marderosian explained to Landman that Reisch would be wiring money directly into buyers' accounts to pay for their down payments and that buyers would then write checks to Landman. Landman assured Reisch that he would look after the money. The evidence indicates that with respect to at least some of the transactions, Landman returned the down payment funds that Reisch had provided back to Reisch, writing checks back to Reisch from the money Reisch had originally given to the buyers.

buyers were signing meaningless promissory notes for second mortgages at the closings because Marderosian told him beforehand that the mortgages would be discharged. At the closings, several buyers asked Landman when the mortgages would be released as promised because the discharge letter accomplishing this was not part of the closing documents (presumably so Bay Loan would not see the letter). Landman made gestures to these buyers to indicate that they should not talk to him about it.[37] All these facts, taken together, support the jury's conclusion that Landman knew that something illegal was being done to get around the down payment requirement.

We reject Landman's argument that there is insufficient evidence to prove he knew Bay Loan was the target of the scheme to defraud. To begin with, Brandon was "completely open" about Bay Loan's involvement and told a number of people involved in the scheme. Several buyers testified that they knew about Bay Loan, including one person whose only involvement was his purchase of a single unit. Landman shared office space with Brandon's point man in the scheme, Marderosian, who was intimately involved in all the details of the scheme. Finally, the closing documents included a letter indicating Bay Loan was the ultimate lender;[38]

Landman acted as escrow agent for many of the closings and also conducted a few of them himself.[39]

Sufficient evidence exists to support the jury's verdict on the conspiracy count and on Counts 21 and 22. Counts 21 and 22 allege bank fraud in connection with the closings of two units at the Hillside Motel. The evidence reveals that Landman returned the down payment funds provided by Reisch in connection with these transactions back to Reisch in violation of the down payment requirement.[40] In addition, one Dean Street employee, Marie Lynch, testified that, in general, she would bring buyers' certified down payment checks to Landman after money was wired by Reisch to the buyers' accounts to accomplish the certification. Lynch testified that she once saw Landman write a check to Reisch for the amount of the down payment funds she had just brought to him. Lynch did not specify which transactions she was referring to in her testimony but the record does contain checks written by Landman to Reisch for the exact amount of the down payment funds wired by Reisch for the Hillside purchases referred to in Counts 21 and 22.[41] We therefore find the evidence sufficient to support the convictions for bank fraud charged in Counts 21 and 22.

37. At one closing, Kumalae "asked Owen if he wanted her to address [the mortgage discharge] at the time," and Landman responded that it "had nothing to do with him ... he didn't want to know anything about it." Another time "Mr. Landman did not want to hear about it in front of us. I do recall him saying, his hands saying not in front of me." Still another buyer testified that Landman "gestured" when confronted with the mortgage discharge issue. Landman argues that his responses and gestures could mean he just did not know anything about it and could not answer the buyers' inquiries. We find that a reasonable jury could also conclude that Landman's actions indicated he already knew that something illegal was going on and was trying to disassociate himself from it.

38. As discussed in footnote 24, Homeowners furnished a letter stating that they transferred their rights in the mortgage to Bay Loan. A similar document was furnished for the transactions brokered by East West. Although the same uncertainty regarding the presence of the letter at the closings discussed in Granoff's case above also exists with respect to Landman, there is more reason to believe Landman saw and read at least

one of the letters because Landman had greater exposure and familiarity with the closing documents.

39. Marderosian testified that when he prepared Landman for the closings which Landman conducted, he "explained what documents [Marderosian] would be preparing and that [Landman] had to oversee their execution at the closing."

40. That evidence consists of a check written by Landman to Reisch for the exact amount of the funds which Reisch had wired into the buyers' accounts for the purchases in Counts 21 and 22. As discussed above, at the time Landman wrote the check, he had already been told what Reisch was doing and had agreed to look after Reisch's money.

41. Although the testimony that Landman "[c]ut a check to Norman" Reisch referred to a transaction sometime in the fall of 1988, roughly a month after the Hillside closings in Counts 21 and 22, it does add some credence to the government's account of Landman's involvement in the scheme to defraud.

This evidence is also sufficient to show willful participation in the conspiracy and thus supports Landman's conviction on Count 1.[42]

Landman argues that his actions were just a normal and proper function of his job as escrow agent. His responsibilities, he claims, were strictly limited to receiving and distributing money at Dean Street's direction. See United States v. Bruun, 809 F.2d 397, 402–03, 410 (7th Cir.1987). This "just following orders" defense cannot stand in the face of the evidence showing that Landman knew down payments were being falsified, that he agreed to safeguard Reisch's down payment funds, and that he personally falsified two down payments by returning the funds to Reisch. The evidence was sufficient to indicate that Landman's intent was to participate in transactions designed to deceive Bay Loan.

 With respect to Counts 23 through 26, relating to closings at the Sandcastle Motel, no checks written by, or to, Landman that involved down payment funds were in evidence. The government stipulated that the relevant checks for these transactions were forgeries. In particular, Landman's signature on the checks for the Sandcastle transactions were forged by Marderosian.[43]

It is true that Landman conducted the closings for the Sandcastle units and thus in some sense facilitated the scheme to defraud,[44] but that alone is not sufficient to show that Landman participated in the relevant act of fraudulently violating the down payment requirement for those individual transactions. On the contrary, it seems that Landman never saw the down payment checks as the money did not go through his escrow account. Instead, the checks were transferred directly to Reisch.

We note that Landman also conducted closings for units at the Atlantic Inn–Narragansett, but the jury acquitted Landman on the charges connected to those transactions (Counts 16 and 17) apparently because it found the act of conducting the closings was, by itself, insufficient to establish the execution of a scheme to defraud. For Counts 23 through 26, once the stipulated forgeries are removed from consideration, there is similarly little evidence to support a conviction beyond the fact that Landman conducted the closings. While the jury is not held to consistent results, we think that the acquittal on Counts 16 and 17 reinforces our judgment that (absent some confusion about the forged checks),[45] there was insufficient evidence to

---

**42.** Landman is wrong in claiming that the jury impermissibly ascribed the illegal actions of Marderosian to Landman. Cf. United States v. Crocker, 788 F.2d 802, 806 (1st Cir.1986) ("[A]scribing criminal liability to [an alleged] conspirator for a co-conspirator's acts by way of the adoption mechanism inherent in a conspiracy requires that the imputed acts be in furtherance of the conspiracy or that they fall within its reasonably foreseeable scope."). Returning down payment funds that are required by the bank is not only within the foreseeable scope of the conspiracy but directly in furtherance of it. The government thus established Landman's criminal conduct independently from that of Marderosian.

**43.** The existence of forgeries does not, as Landman claims, provide conclusive proof of his innocence on all the counts. Just because his name was forged on some of the checks does not necessarily imply that Landman did not know of, or agree to go along with, the conspiracy. In other words, it is not true that the forgeries could only indicate that Marderosian was forced to go behind Landman's back to accomplish the scheme to defraud. For one, Marderosian testified that Landman authorized some of the forger-

ies and indicated that forging Landman's name was a method of convenience rather than a way to hide illicit activity from Landman. More importantly, Landman did write checks for illegal transactions in Counts 21 and 22, which, in conjunction with the other proof of Landman's knowledge and intent, is sufficient to uphold the conspiracy charge.

**44.** Lynch's testimony that Landman wrote a check to Reisch for the Sandcastle units is decisively contradicted by the government's stipulation that the checks were forgeries.

**45.** There was apparently some confusion surrounding the exhibits containing the forged checks. The government agreed to use the checks only against the other defendants, namely Reisch, but argued during closing argument that Landman was responsible for the checks written to Reisch on the Sandcastle units. The government did not explicitly state that Landman signed the forged checks; however, it failed to acknowledge the stipulation of forgeries and seemed to imply no forgeries existed. In any event, we are convinced that the jury improperly considered the forged checks in their guilty finding on Counts 23 through 26.

convict on Counts 23 through 26. Because the evidence is insufficient to prove that Landman executed or aided in the execution of the schemes to defraud Bay Loan charged in Counts 23 through 26, we reverse his conviction on those counts.

### 7. Momi Kumalae

■ Kumalae was convicted of conspiracy and three counts of bank fraud in connection with various actions she took while working as an assistant to Brandon at Dean Street.[46] The evidence establishing Kumalae's knowledge of Bay Loan's down payment requirement and the scheme to fraudulently violate it is the following: (1) Brandon testified that he told Kumalae about his relationship with Bay Loan; (2) an East West employee testified that she asked Kumalae to forward information about the unit buyers so that she could satisfy the guidelines established by Bay Loan; (3) Kumalae was present during some of the conversations between Brandon, Ward, Hagopian and a buyer in which down payments were discussed; (4) Kumalae was also present at a meeting at which Brandon said "they needed to show down payments or something so they were going to wire money into the accounts or deposit it and they needed one of our checks to prove that it came out of our account"; (5) Kumalae told one buyer that she needed a check from him and that she would be "doing the transactions at the banks"; (6) Kumalae assured one buyer whose down payment check had not been negotiated that his check had not been used; and, (7) Kumalae instructed another Dean Street employee, Marie Lynch, who had asked about the discharges of the second mortgages that "there weren't supposed to be any second mortgages and to just don't worry about it. They were being taken care of."

The evidence that she willfully participated in this scheme is as follows: (1) Kumalae advised buyers of how their down payment requirement would be satisfied;[47] (2) she once wired money from her own account to a buyer in order to fund his down payment;[48] (3) she signed several of the mortgage discharge letters provided to the buyers;[49] and, (4) she received some of the down payment checks, and because several of these checks were deposited directly into Reisch's account, presumably by Kumalae, she effected the return of down payment funds to their source in violation of the down payment requirement. All of this evidence is sufficient to support Kumalae's bank fraud and conspiracy convictions.

Kumalae attempts to rely on cases holding that a defendant's mere presence at the scene of the crime or mere association with criminals to whom all the evidence at trial pertains is insufficient to support a conviction for conspiracy. *United States v. Ocampo*, 964 F.2d 80 (1st Cir.1992); *United States v. Mehtala*, 578 F.2d 6, 10 (1st Cir.1978); *United States v. Joiner*, 429 F.2d 489, 493 (5th Cir.1970). Kumalae's reliance on these cases is misplaced because the government's case rested on Kumalae's own knowledge of the scheme to defraud based on her own statements to others and on a series of actions taken by Kumalae herself that directly defrauded Bay Loan. Kumalae's argument that she was just acting in good faith by performing ministerial duties for Dean Street and nothing more also fails. The record is clear that Kumalae wired down payment funds to buyers from her own account and

---

**46.** The jury found Kumalae not guilty on one count of bank fraud.

**47.** Kumalae told one buyer "no down payments" were required and that Brandon was a "stand-up guy" who would "take care of things and not to worry." On another occasion she told a buyer that his mortgage discharge "would be taken care of after the closing."

**48.** This was the basis for the transaction for Count 15 and is sufficient to support her conviction on that count.

**49.** One buyer testifies that he picked up his discharge letter and the letter of another buyer directly from Kumalae. These discharges were made for the transactions in Counts 24 and 25. We note that the jury acquitted Kumalae on Count 23 presumably because there was no such testimony to support Kumalae's involvement with the discharge.

signed mortgage discharge letters. These actions were not merely "ministerial duties."

## V. SEVERANCE

The district court denied the motions for severance [50] made by several of the defendants [51] who argued that they were unfairly prejudiced by the evidentiary spillover from the case presented against their more culpable co-defendants. The defendants' claim is that the joint trial seriously limited the jury's ability to sift through all the evidence against each individual defendant and increased the risk that the jury would base its verdicts on evidence which has no bearing on the guilt or innocence of defendants with a more limited involvement in the scheme. Whatever the advisability, in general, of holding mass trials in complicated cases with many defendants of varying culpabilities, we do not find any significant degree of unfairness or prejudice in this case that would warrant a reversal of the district court's refusal to sever the trial.

 The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court and we will reverse its refusal to sever only upon a finding of manifest abuse of discretion. *United States v. Olivo–Infante*, 938 F.2d 1406, 1409 (1st Cir.1991); *United States v. Natanel*, 938 F.2d 302, 308 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Boylan*, 898 F.2d 230, 246 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *see also United States v. Searing*, 984 F.2d 960, 965 (8th Cir.1993) ("In the context of conspiracy, severance will rarely, if ever, be required."). Defendants seeking a separate trial must make a strong showing of evident prejudice. *United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir.1993); *United States v. Martinez*, 922 F.2d 914, 922 (1st Cir.1991). This showing must demonstrate that the joint trial prevented the jury from separating

the evidence against each defendant and reaching a reliable verdict. *Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *O'Bryant*, 998 F.2d at 25–26.

 There is no indication in this case that the jury was unable to distinguish the various charges and defendants or to sort properly through the evidence relating to each defendant. The jury demonstrated its ability to independently assess the evidence when it acquitted four of the defendants on individual bank fraud counts, *see United States v. Figueroa*, 976 F.2d 1446, 1452 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993) (finding acquittals to be a relevant factor in upholding a denial of severance); *United States v. Dworken*, 855 F.2d 12, 29 (1st Cir.1988) (same), and when it asked that specific portions of the transcript relating to specific defendants be read to them. In addition, the trial judge provided a number of limiting instructions throughout the trial that alleviated any potential prejudice. *See Figueroa*, 976 F.2d at 1452; *United States v. Tejeda*, 974 F.2d 210, 219 (1st Cir.1992).

The degree of prejudicial spillover appears minimal as no defendant has demonstrated which, if any, evidence presented at trial would have been inadmissible if presented against that defendant at a separate trial. The government presented sufficient evidence to show that all defendants were involved in a single interdependent conspiracy, *see* Section IX.B., and most of the evidence at trial was related to the development and operation of that conspiracy. "Where evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." *O'Bryant*, 998 F.2d at 26 (collecting cases). Moreover, "[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is

---

**50.** The rule authorizing motions for severance states in pertinent part:
> If it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

**51.** Granoff, Gauvin, Hagopian, Reisch, Kumalae, and Ward all moved for severance before and during trial and all raise the issue on appeal.

far less than the involvement of others, we have been reluctant to secondguess severance denials." *Boylan,* 898 F.2d at 246 (citations omitted). We therefore affirm the judge's decision to deny the severance motions.

## VI. PRETRIAL PUBLICITY

On January 1, 1990, the Governor of Rhode Island ordered the closure of credit unions in that state insured by a private entity known as the Rhode Island Savings Deposit Insurance Corporation (RISDIC). After years of risky real estate investments, many credit unions were unable to weather the late 1980s crash in the real estate market and RISDIC could not cover their anticipated losses. In the process of closing the credit unions, the governor froze the assets of hundreds of thousands of angry depositors. The ensuing panic among depositors as well as the public hearings, criminal investigations, and civil lawsuits received extensive media coverage. The Rhode Island credit union crisis, although coexistent with Dean Street's downfall, is not related to the present case.

Defendants raised a series of claims related to the district court's alleged failure to shield them from the prejudicial effects of publicity surrounding the Rhode Island credit union crisis. They argue that their right to an impartial jury was jeopardized by the trial court's denial of their change of venue motion, their request for individual voir dire, their request to question the jurors about losing money in the credit union crisis, and their request for a mistrial or curative instructions after the admission of certain evidence relating to the failed credit unions. As we find no significant threat to the trial's fairness from the effects of unfavorable publicity, we uphold the district court's denial of the motions related to prejudicial publicity.

### A. Change of Venue

 The decision to grant a change of venue [52] is within the sound discretion of the

trial court and is reviewed for abuse of discretion. *United States v. Rodríguez–Cardona,* 924 F.2d 1148, 1158 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Angiulo,* 897 F.2d 1169, 1181 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). Change of venue is proper where the level of prejudice against a defendant precludes a fair and impartial trial because the community is saturated with inflammatory publicity about the case. *Rodríguez–Cardona,* 924 F.2d at 1158; *Angiulo,* 897 F.2d at 1181; *United States v. Moreno Morales,* 815 F.2d 725, 731 (1st Cir.), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987).

 Defendants proffered forty-four newspaper articles relating to Dean Street and their criminal case, as well as other examples from the media which purported to show negative feelings stemming from the credit union crisis against those who benefited from failed financial institutions. Defendants claim that this demonstrated widespread prejudice among potential jurors against them. They argue that the jurors would not distinguish Bay Loan from the failed credit unions and consequently the jurors would direct their hostility toward those involved in the credit union crisis against the defendants at trial.

We find that the publicity relating to this case did not particularly saturate the community with inflammatory sentiment nor do we have any reason to believe that the jury was anything but impartial. The articles presented by the defendants evidence standard factual press coverage of a criminal case and are neither inflammatory nor sensational. *See Angiulo,* 897 F.2d at 1181 (stating that prejudice will not be presumed in the case of merely factual reporting, instead "the publicity must be both extensive *and* sensational in nature"). Only five of the forty-seven prospective jurors had ever read or heard about the case and none of them sat on the jury. We find nothing in the record to indicate that

---

**52.** The trial court, upon a defendant's motion, will transfer the trial to another district if the court is satisfied that there exists in the district where the prosecution is pending so

great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial.
Fed.R.Crim.P. 21(a).

the jurors' feelings about the credit crisis, if they had any, impaired their impartiality in the present case. The trial judge appropriately cautioned the jury about the need to separate the credit crisis from this case and, as discussed below, he conducted a voir dire that sufficiently investigated possible bias. The trial judge determined that the jurors would understand that the credit crisis had no connection to this case when he denied the change of venue motion and we find no abuse of discretion in this conclusion.[53]

## B. Voir Dire

Defendants argue that the denial of their request for individual voir dire and their request for jurors to be asked whether they had lost money in the credit unions jeopardized their right to an impartial jury. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Defendants claim that as a result of these rulings the court did not adequately investigate possible bias against defendants stemming from the credit union crisis. *See, e.g., United States v. Gillis*, 942 F.2d 707 (10th Cir.1991).

The trial court has broad discretion in conducting voir dire. *United States v. McCarthy*, 961 F.2d 972, 976 (1st Cir.1992); *Real v. Hogan*, 828 F.2d 58, 62 (1st Cir.1987). "It is more than enough if the court covers the substance of the appropriate areas of concern by framing its own questions in its own words." *Hogan*, 828 F.2d at 62 (cita-

tions omitted). In this case, the judge adequately probed prospective jurors for possible bias related to the credit union crisis [54] and specifically inquired several times whether any of the jurors or their families had "lost money in a bank fraud or anything of that sort." One juror responded affirmatively to the court's questions in this area and was excused.[55] Throughout the voir dire, any juror responding to the court's queries was subjected to individual questioning by the judge and by counsel. For these reasons, we find no errors in the voir dire process.

## C. Prejudicial Evidence

During the trial, the judge admitted evidence relating to some of the failed credit unions and individuals involved in the credit union crisis. Specifically, during the government's direct examination of Marderosian in which he was questioned about the use of Bay Loan funds obtained from the Sandcastle closings, Marderosian explained that, in accordance with Brandon's instructions, he had deliberately failed to pay a preexisting $1.5 million mortgage held by the Rhode Island Central Credit Union. Instead, he used the loan proceeds to pay off other Dean Street creditors. Included in the lengthy list of these creditors admitted at trial were Robert Barbato, Atrium Financial, and Davisville Credit Union. All of these entities and individuals were involved in the RISDIC credit union crisis.[56] Defendants objected to the

---

**53.** We also reject the allegation of actual juror prejudice based on the unsubstantiated claim that there was a *chance* that actual prejudice *existed which could have been revealed* if the judge asked the right questions during voir dire. As we find no errors in the voir dire process, *see* subsection B, and no other indication of actual prejudice, we find this allegation unfounded.

**54.** Specifically the judge told prospective jurors:

One thing I should caution you about is some of you may be aware that there has been some publicity in Rhode Island recently about the credit unions and the difficulties that they've experienced, and I want to be sure that everyone understands that this case is not in any way related to those events. Is there anybody who thinks they would have difficulty in separating this case from anything you might have heard about the problems credit unions in Rhode Island have experienced?

**55.** Defendants make an additional argument that because jurors were told that the credit crisis had no relation to this case, they did not think losing money in credit unions was important before the trial started and thus would not have responded to the judge's comments during voir dire. Yet, once evidence linking defendants to the credit crisis was presented at trial, *see* subsection C, the issue of losing money became critical and the risk of bias was no longer adequately addressed by the voir dire. The creativity of this argument is matched only by its improbability and speculative nature. We summarily reject it.

**56.** Rhode Island Central Credit Union and the Davisville Credit Union were among the institutions closed as a result of RISDIC's failure. (Davisville apparently failed despite Dean Street's preferred payment on its debt with them). Robert Barbato, who purportedly was connected to organized crime, was a heavy bor-

evidence and moved for a mistrial arguing that the evidence was irrelevant and highly inflammatory.

■ The decision to admit or exclude evidence under Fed.R.Evid. 403 [57] is committed to the broad discretion of the trial court and we will reverse the court's judgment only rarely and in extraordinary compelling circumstances. *United States v. Nickens*, 955 F.2d 112, 125 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); *United States v. McMahon*, 938 F.2d 1501, 1507 (1st Cir.1991). Rule 403 requires a balancing of the probative value of a piece of evidence against its prejudicial effect. *United States v. Rodríguez Cortés*, 949 F.2d 532, 540 (1st Cir.1991). Exclusion is proper only when the probative value is "substantially outweighed" by the risk of prejudice. *McMahon*, 938 F.2d at 1508.

■ The admitted evidence was relevant to the issue of whether Marderosian was stealing the loan proceeds for Bay Loan or passing them on as Brandon directed. Marderosian, the government's key witness, was attacked by the defense and the media as the main culprit in the scheme and the government sought to bolster the credibility of his testimony by showing that Marderosian did not improperly divert any of the large sums of money that he handled into his own pocket. The evidence also helped provide a foundation for later expert testimony regarding what happened to the funds obtained from Bay Loan in the course of the scheme to defraud.

The relevancy of the evidence sufficiently outweighed the minimal prejudicial effect that was created by the brief mention of individuals and entities that were connected to the credit union crisis. First of all, nothing at trial linked the named individuals and entities to RISDIC or the credit union crisis. In order to find prejudice, the court would

have had to infer that the jury had heard of the individuals and entities from an external source and also knew of their involvement in the credit union scandal.[58] Even if the jurors did know of the involvement of the named individuals and entities, it is doubtful, given the court's various cautioning instructions and the voir dire process, that jurors would likely be biased against defendants just because certain names were mentioned at trial. At most, the jurors might conclude that defendants contributed to the failure of at least one credit union by not repaying certain loans. The trial judge asked the jurors, however, if they had lost any money from bank fraud related schemes and no sitting jurors said they had. Thus we have no reason to believe that any juror who may have inferred that defendants contributed to the credit union crisis would be particularly likely to find defendants guilty without fairly considering the evidence. Finally, to the extent that the balancing of relevance and prejudice was a close call, we find no abuse of discretion and uphold the trial court's admission of the disputed evidence.

## VII. EXCLUSION OF EVIDENCE

During the trial, defendants attempted to proffer evidence regarding the allegedly common practice by financial institutions of requiring no down payment on the sale of commercial real estate. On cross-examination of several government witnesses, Hagopian's attorney asked whether it was customary during the relevant time period to buy and sell commercial properties with no money down and to obtain 100% financing. The government objected on relevancy grounds and the district court sustained the objections. On another occasion, Brandon presented an expert witness, James White, to bolster the credibility of certain testimony. Brandon had testified that Bay Loan Vice President Gormley acknowledged that the

rower of the credit unions. Atrium Financial was owned in part by one of the key figures in the credit union crisis.

**57.** Rule 403 provides in part:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....

Fed.R.Evid. 403.

**58.** The judge offered to question the jurors about their possible knowledge of the persons named in the disputed testimony but defense counsel refused.

proposed end loans to unit buyers actually constituted one single commercial loan to Dean Street, even though they were to be submitted individually as consumer residential loans. Brandon sought to present Mr. White's opinion that the loans at issue were more consistent with commercial rather than consumer loans. The district court again excluded the testimony on relevancy grounds. We affirm the trial court's rulings.[59]

■ In general, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible." Fed.R.Evid. 402. The district court has broad discretion in making relevancy determinations and we must review its decisions only for abuse of that discretion. *United States v. Griffin,* 818 F.2d 97, 101 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *United States v. Lamberty,* 778 F.2d 59, 61 (1st Cir.1985). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *Lamberty,* 778 F.2d at 61.

Defendants argue that the excluded evidence is relevant to one of their theories of the case: (1) either that Bay Loan knew of and approved their falsification of down payments; or (2) that defendants did not know about, or intend to violate, Bay Loan's down payment requirement. The proffered evidence, however, does not make either of these theories any more likely to be true and thus the evidence is irrelevant.

59. Because we find the disputed evidence was not relevant to defendant's case, we also reject Brandon's argument that the trial court impaired his right to present his theory of defense.

60. The same problem exists regarding the connection between the fake down payments and the expert's distinction between residential and commercial loans. Brandon sought to characterize the mortgages from Bay Loan as more like commercial than consumer loans and thus subject to different standards and policies. Specifically, he sought to show that 100% financing was normal for commercial loans and to counter the allegedly critical contention that residential loans typically require down payments. This is basically the same type of evidence as the testimony that

■ As for the first theory, Brandon tried to show at trial that Bay Loan aggressively purchased non-conforming loans, that he openly sought 100% financing from the bank, and that Bay Loan agreed to provide the financing without down payments by directing Dean Street to falsify the paperwork to show the existence of down payments. The expert testimony and the government witness's testimony about the common practice of no down payment financing may add support to the first two assertions, but those assertions are simply not at issue in this case. Rather, Bay Loan's alleged approval of false down payments is at issue. The defendants, however, have not demonstrated any relationship between the proffered evidence that no down payment financing was a common practice and the likelihood that Bay Loan directed Dean Street to falsify paperwork to misrepresent the existence of down payments that were never made.

The problem with defendants' argument is that no connection between the common use of 100% financing and the use of false down payments was ever established.[60] That is, for the evidence to be relevant, there must be some reason to believe that 100% financing, or no down payment financing, is customarily provided in conjunction with paperwork showing fake down payments. A no down payment custom does not establish a fake down payment custom. The defendants lack, therefore, any foundation that would make the proffered evidence relevant.

" 'Trial judges have wide discretion in deciding whether an adequate foundation has

100% financing was customary in the industry. That is, a showing that Bay Loan's mortgages were commercial helps to establish the likelihood that the loans were actually "no down payment loans." *This still leaves us without the missing foundational link*—that no down payment financing is somehow associated with falsified down payments.

In response to Brandon's claim that the government proved its case by showing the transactions deviated from the norm, we note that the relevant norm is not 100% versus 80% financing but the standard method of representing down payments, or lack thereof, in loan transactions. Proof of a no down payment norm does not establish a fake down payment norm.

been laid for the admission of evidence.'" *Veranda Beach Club Ltd. Partnership v. Western Surety Co.*, 936 F.2d 1364, 1371 (1st Cir.1991) (citing *Real v. Hogan*, 828 F.2d 58, 64 (1st Cir.1987)); *see also United States v. Young*, 804 F.2d 116, 119 (8th Cir.1986), *cert. denied*, 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987). No foundation was laid in this case. Even if we accept 100% financing was in fact generally common in the industry and for Bay Loan, it does not follow that Bay Loan's approval of false down payment transactions is any more likely. Defendants must provide, for example, some evidence that the recording of down payments in no down payment transactions was a common formality, perhaps for accounting, tax or bookkeeping purposes,[61] or for the convenience of some interested party. If such evidence existed, then maybe a sufficient foundation would exist for the relevance of 100% financing. However, no such foundation is evident in the record.

What defendants were really trying to show is that the bank or its officials were themselves perpetrating some sort of fraud and the defendants were unwittingly caught up in it. This assertion, however, also lacks foundational support. The defendants want the proffered evidence to establish that Bay Loan was in the practice of providing 100% financing and thus likely to be providing 100% financing in this case as well, regardless of whether such financing involved fake down payments, kickbacks or fraudulent paperwork. This formulation, however, obscures the real issue: if Bay Loan intended to provide 100% financing, or if defendants thought down payments were waived, why did they have to take actions to falsify down payments? To satisfy this requisite foundational question, the defendants had to show either that, (1) officials at Bay Loan stood to

reap some personal gain by offering loans with no down payments in violation of the bank's requirements and thus needed to falsify down payments to hide the violation from bank superiors; or (2) the bank as a whole stood to reap some gain by lending money under false pretenses, perhaps to deceive their creditors, shareholders, or regulators.[62] In the absence of some evidence supporting these two propositions, the custom of 100% financing or the characterization of the loans as commercial as opposed to residential does not make Bay Loan's approval of fraudulent down payments any more likely to be true. Again, the foundational link is simply missing.

The excluded evidence is similarly irrelevant to defendants' lack of knowledge or intent to defraud Bay Loan. Defendants claim that evidence that 100% financing was a standard practice supports their claim that they did not know or suspect anything was unusual or illegal about the loan transactions they participated in. Again, what is at issue is the existence of falsified down payments. There is no basis for finding that defendants were more likely to think that their actions to facilitate the documentation of nonexistent down payments were somehow legitimate just because 100% financing was customary. To put it another way, the proffered evidence does not make the false down payment maneuvers less likely to tip off the defendants to the illegal nature of the transaction without some foundation connecting 100% financing to creative down payment paperwork of some kind. Defendants were not engaged in what appeared to them to be a "no down payment transaction"; they were doing what appeared to them to be a transaction where a paper down payment was documented and recorded but not actually paid. The no down payment custom would only be relevant to

---

61. Brandon claims that Bay Loan directed him to falsify down payments so that the bank could package the commercial loans as residential loans. Were his claim true, however, it would not make the common practice of providing commercial loans, and the 100% financing such loans allegedly involve, any more relevant to the issue of why the falsification of down payments is justifiable. Still lacking is some indication that the common practice of lending money without down payments makes it more likely that the

bank would find it necessary to mischaracterize loans and consequently direct Dean Street to produce false down payment paperwork.

62. Defendants presented evidence that Bay Loan was knowingly lending in violation of other requirements it imposed, not the least of which was the requirement that buyers live in the condominiums they purchased which was impossible given the units were to be operated as motels.

intent if that custom involved something even vaguely similar to this sort of paper down payment. Because no such foundation exists on the record, and because we find no abuse of discretion on the part of the trial court in refusing to allow the jury to assume or infer that foundation, we uphold the exclusion of the proffered evidence.[63]

## VIII. PREJUDICE FROM COMMENTS REGARDING DEFENDANTS' ETHNICITY

 During the fifth day of trial, the government's main witness, Marderosian, testified about a comment made by defendant Landman concerning the religious affinity between Landman and co-defendant Reisch. Marderosian was describing on direct examination the arrangement for Reisch to wire down payment money into buyers' accounts. The arrangement was designed, in part, to allay Reisch's concern that too much money would be outstanding between the time he provided funds to the buyers and the time the funds were returned to him by Dean Street. In reference to a discussion between Marderosian and Landman,[64] the government asked: "What, if anything did Mr. Landman say to you about concerns expressed by Mr. Reisch?" Marderosian responded:

> Mr. Landman stated to me on one occasion, I am not sure if it was that occasion, that Mr. Reisch appeared comfortable doing it this way and part of the reason for that, Mr. Landman explained, was that Mr. Landman was involved and he was Jewish and Mr. Reisch was Jewish and that the level of comfort shouldn't be underestimated by me.

Defendants did not immediately object to this statement after it was made; however, Reisch's attorney moved to dismiss later that same day. The judge denied the motion and also denied later defense motions for a mistrial. Defendants argue that the testimony invited the jury to make the impermissible inference that members of the same religion would be more likely to trust each other and join in a conspiracy and also that the testimony may have provoked anti-Semitic feelings among jurors. When defendants first raised their objections, the trial judge asked counsel what they wanted him to do and the judge offered to try and ferret out any possible anti-Semitism on the jury. Counsel's only request was for dismissal. Counsel did not request further questioning of the jury on this matter and expressed displeasure with the possibility of providing curative instructions because "instructions would only magnify the problem."

Under these circumstances, we do not think that the trial court's actions constitute reversible error despite the possible inappropriateness of the testimony. The level of prejudice, if any, was not sufficiently significant to overturn the judge's decision to accept the defendants' tactical choice to forgo more appropriate methods of addressing the potential prejudice in favor of the unrealistic and unnecessary solution of a dismissal or a new trial. Cf. United States v. De La Cruz, 902 F.2d 121, 124 (1st Cir.1990) (noting the reluctance of this court to require trial judges to override plausible strategic choices on the part of counsel in the context of remedying potential prejudice); United States v. Goldman, 563 F.2d 501, 505 (1st Cir.1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978) (refusing to reverse verdict in trial with prejudicial references to religion because the trial judge gave curative instructions).

**63.** Unlike the cases cited by defendant that have held that a certain custom or practice in an industry may be relevant to the defendant's case, United States v. Aversa, 984 F.2d 493 (1st Cir. 1993) (en banc); United States v. Seelig, 622 F.2d 207 (6th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); United States v. Riley, 550 F.2d 233 (5th Cir.1977), the proffered custom in this case is unrelated to the alleged illegal activity.

**64.** Marderosian's testimony about Landman's statement properly falls under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), because the evidence clearly establishes beyond a preponderance of the evidence that Marderosian, Landman and Reisch were all members of the conspiracy and the statement was made during the course of and in furtherance of the conspiracy. See United States v. Angiulo, 897 F.2d 1169, 1201–02 (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

The prejudicial effect of Marderosian's statement appears quite limited. The reference to defendants' Judaism was the only such mention of religion at trial. It amounted to one brief sentence in nineteen days of testimony and argument. There was no subsequent reference to the challenged testimony nor did the government use the issue of religious affinity in its closing argument. The inference of Jewish affinity was not, as defendant Landman claims, central to the government's case. The basis of Landman's agreement to participate in the conspiracy was not his promise to protect the interests of Reisch but his agreement with Marderosian and Brandon to facilitate the unit sales without down payments. As discussed above, *see* Section IV.B.6, the record contains sufficient facts regarding Landman's actions and statements made by, and to, him to support his knowledge and participation in the conspiracy. None of these facts have anything to do with Landman's supposed religious affinity with Reisch.[65] Likewise, the evidence against Reisch centers around his agreement with Brandon to provide money to the scheme and not around his relationship with Landman. In fact, Landman was acquitted by the jury on two bank fraud counts that involved the funding of down payments by Reisch in which Landman conducted the closings. This indicates that the jury was not prejudiced and did not rely on the disputed testimony in its verdict.

Nothing like the serious prejudicial circumstances found in *United States v. Rodriguez Cortés*, 949 F.2d 532 (1st Cir.1991) (finding reversible error from ethnically prejudicial evidence), exists in this case. In *Rodriguez Cortés*, the district court had found a defendant's Colombian identification card admissible based on the impermissible assumption that Colombians were more willing to trust fellow Colombians than anyone else, and therefore, defendant was likely to be involved with his Colombian co-defendants. *Id.* at 540. This connection was emphasized in the government's closing argument. *Id.* at 541. Here, there was no objection to the

relevancy of Marderosian's statement and thus no ruling based on an impermissible inference. The judge recognized the potential for prejudice and offered to take steps to rectify the problem. More importantly, the government did not invoke any inferences based on religious affinity in its final argument before the jury. Similarly, *United States v. Cruz*, 981 F.2d 659 (2d Cir.1992), and *United States v. Doe*, 903 F.2d 16 (D.C.Cir.1990), are distinguishable from the present case because those cases involved the government's explicit use of the impermissible reasoning, upon extensive direct examination and on summation, for crucial parts of its theory of the case.

Defendants suggest there was an element of prosecutorial misconduct in eliciting the disputed testimony from Marderosian. Marderosian had made a similar statement about defendants' Judaism when he testified before the grand jury and the pattern of questioning prior to Marderosian's statement at trial could be construed as an attempt to elicit the same testimony from him a second time. At the bench conference with the judge, the prosecutor denied knowing beforehand that Marderosian would make the comment about defendants' religion and claimed to have instructed Marderosian to limit his testimony to the fact that Landman said Reisch felt comfortable with the arrangement. While the circumstances are somewhat troubling, we do not find sufficient evidence of prosecutorial misconduct to reverse the verdicts in this case, especially in light of the absence of any reference to the religious comment in the government's summation. *Compare Goldman*, 563 F.2d at 504–05 (prosecutor, on summation, referred to fact defendant was wearing "what they call in the Jewish religion a yamaka [sic]" and that the symbol he was wearing "has been defamed, defiled and scandalized").

## IX. JURY INSTRUCTIONS

Defendants make three challenges to the

---

**65.** There is also sufficient testimony, quite apart from the disputed comment, that Landman agreed to look after Reisch's interests. Marderosian testified that Reisch told Landman that "he wanted Mr. Landman to look out for his interest to protect his money to the extent possible." Landman later told Marderosian "he would try to protect Mr. Reisch to the extent possible."

448

jury instructions in this case.[66] They allege that the trial judge failed to provide proffered instructions concerning the required proof of intent for conspiracy and the possibility of multiple conspiracies. They also argue that it was error for the judge to give an instruction concerning willful blindness.

### A. The *Direct Sales* Conspiracy Instruction

The defendants proffered a jury instruction [67] based on the rule derived from *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 713, 63 S.Ct. 1265, 1269, 1270, 87 L.Ed. 1674 (1943), that one who supplies goods to another knowing that the recipient will use them for an illegal purpose cannot, on that basis alone, be found guilty of conspiring with the recipient. Rather, for the supplier to be culpable, he or she must have the intent to further, promote, and cooperate in that illegal purpose. *Id.; United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.), *aff'd.,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). The district court did not give the defendants' proffered instruction but instead instructed the jury that "to be a member of a conspiracy, a Defendant must have willfully joined it or participated in it for the purpose of advancing or furthering its unlawful purposes." The court also stated that the government must prove each defendant's "intent to participate in the unlawful scheme." Defendants argue that this instruction inadequately addressed the intent requirement laid out in *Direct Sales* and *Falcone.*

■ The trial court's failure to give a proffered instruction will not be reversed unless that instruction is (1) substantively correct; (2) was not substantially covered in the charge actually given; and (3) concerned an important point such that the failure to give it seriously undermined the defendant's ability to present a particular defense. *United States v. McGill,* 953 F.2d 10, 13 (1st Cir.1992); *United States v. Perkins,* 926 F.2d 1271, 1283 (1st Cir.1991). In this case, defendants fail to get past the second prong of the test.

■ The district court's instruction, which states that a defendant must have "the purpose of advancing or furthering" the unlawful purpose of the conspiracy, substantially covers the substance of defendant's proffered instruction. The judge also informed the jury that defendant had to "willfully join[ ]" the conspiracy, that defendant had to have both the intent to agree to join the conspiracy and the specific intent to commit bank fraud, and that defendant had to have the intent to participate in the unlawful scheme. All of these instructions together more than adequately address the requirements of *Direct Sales* and *Falcone* that defendant must join the conspiracy with the specific intent to accomplish its illegal purpose. *See United States v. Arias–Santana,* 964 F.2d 1262, 1268 (1st Cir.1992) (finding no error where jury charge covered the substance of defendant's requests); *McGill,* 953 F.2d at 12–13 (same). We have upheld the

66. Defendant Granoff makes an additional argument that the trial judge erroneously failed to instruct the jury that they must find that defendants knew of Bay Loan's federally insured status and that defendants knew Bay Loan was the target of the scheme to defraud. Because we found that neither of these elements were required for a conviction under the bank fraud statute, *see supra* Section IV, the trial court did not err in refusing to give the proffered instructions.

The trial judge was thus correct in instructing the jury that:

> it is not necessary for the Government to prove that the Defendant knew the identity of the particular financial institution or that the Defendant knew that that institution was Federally chartered or insured.... It must, however, prove that the Defendant intended to defraud a financial institution.

67. The instruction stated, in pertinent part:

> You are instructed that a person who may have furnished goods, money or services to another person who he knows is or will be engaged in criminal activity ... does not by furnishing such goods, money or services necessarily become a member of the conspiracy. Instead, ... the government must show beyond a reasonable doubt that the defendant was aware of the conspiracy and knowingly and voluntarily joined it with the intent of furthering its illegal aims.

> To reiterate, it is not enough that the Government prove that a particular defendant acted in a way that furthered the purposes or objectives of the conspiracy. Instead the Government must prove beyond a reasonable doubt that the defendant acted while knowing of the unlawful agreement and with the intention to participate in it.

adequacy of nearly identical instructions in the past. *See United States v. Hensel*, 699 F.2d 18, 37–38 (1st Cir.1983).

The defendants focus on the fact that the trial judge did not explicitly state that mere knowledge by the defendant that the goods he or she provides to a conspiracy will be used illegally is not sufficient to prove an intent to join the conspiracy. This instruction, defendants allege, is necessary to properly define "intent to participate" or "intent to join" a conspiracy. Without an expression of the innocent case, they add, the instructions leave open the door for the impermissible inference that a defendant can be guilty of conspiring to defraud Bay Loan simply by providing money to Dean Street knowing it would be used illegally. Defendants claim that because the murky distinction between lawful cooperation and illegal participation is especially close in this case, the district court had a special obligation to be clear.

In some situations, this type of "negative" *Direct Sales* instruction might be required, but we see nothing in the facts of this case that makes the distinction between simply knowing of the illegal nature of the scheme and agreeing to further the scheme particularly crucial to the defense. The central defense of most defendants was that they did not know that Dean Street was doing anything illegal in obtaining the loans. Once knowledge of illegality is established, the evidence of defendants' participation, as opposed to merely providing goods and services to the conspiracy, is overwhelming and not, as defendants assert, a close call. *See supra* Section IV.

In any event, we think the trial court's instructions were quite clear that (1) "[i]n order to be a member of a conspiracy, a Defendant must have willfully joined it or participated in it for the purpose of advanc-

ing or furthering its unlawful purpose"; and (2) that defendant must have both an intent to agree to join the conspiracy and the specific intent to commit bank fraud. These instructions adequately defined the requisite "intent to participate" and foreclosed any inference that knowingly providing goods to a criminal enterprise is itself sufficient to support a finding of intent to join the conspiracy. The trial court need not employ the most elegant or concise phraseology nor must it incorporate the precise language of defendants' request as long as the instructions taken as a whole "accurately communicated the meat of the defense's theory." *McGill*, 953 F.2d at 12. In this case, the court's instructions adequately communicated the defendants' theory that mere knowledge and assistance, without an intent to further the enterprise, is not enough.

### B. Instruction On Multiple Conspiracies

The defendants also challenge the trial court's refusal to instruct the jury as to the possibility of multiple conspiracies.[68] Such an instruction was warranted, they claim, because the evidence indicated that different defendants had different relationships with Dean Street and were involved in separate schemes. Although the judge may have erred in refusing to charge multiple conspiracies, we find insufficient prejudice to warrant a reversal of the convictions.

A trial court should grant a defendant's request for a multiple conspiracy instruction if, "on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged." *United States v. Boylan*, 898 F.2d 230, 243 (1st Cir.1990); *see also United States v. Dennis*, 917 F.2d 1031, 1033 (7th Cir.1990); *United*

---

**68.** The defendants' proffered instruction stated in part:

Where persons have joined together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.
. . . .
In deciding whether a single overall conspiracy as charged in the indictment has been prov-

en beyond a reasonable doubt you should look at whether there were multiple agreements reached, whether there were additions or withdrawals of alleged conspirators, and most significantly, whether the evidence shows beyond a reasonable doubt that all of the alleged conspirators directed their efforts toward the accomplishment of a common goal or overall plan.

States v. Dwyer, 843 F.2d 60, 61–62 (1st Cir.1988). As it is highly likely that the voluminous and complex record in this case, viewed in the light most favorable to the defendants, would allow for a plausible conclusion that more than one conspiracy took place, we start from the assumption that the trial court erred in its failure to give the multiple conspiracy instructions. Our task, then, is to determine if the degree of prejudice from the possible error necessitates a reversal. We find that it does not.

We will reverse a court's erroneous refusal to give a substantively correct instruction only when that instruction concerned an important point such that the failure to give it seriously undermined the defendant's ability to effectively present a given defense. *United States v. McGill*, 953 F.2d 10, 13 (1st Cir.1992); *United States v. Perkins*, 926 F.2d 1271, 1283 (1st Cir.1991). In the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme. *Dwyer*, 843 F.2d at 62; *United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir.1981). The prejudice we must guard against, therefore, is evidentiary spillover resulting from trying defendants *en masse* for distinct and separate offenses committed by others. *Kotteakos v. United States*, 328 U.S. 750, 756–77, 66 S.Ct. 1239, 1243–54, 90 L.Ed. 1557 (1946); see also *Blumenthal v. United States*, 332 U.S. 539, 558–60, 68 S.Ct. 248, 257–58, 92 L.Ed. 154 (1947).

We find the risk of evidentiary spillover to be significantly limited in this case because we fail to see which, if any, pieces of evidence would not be relevant to and admissible against any of the defendants individually. Although the record does not foreclose the possibility of multiple conspiracies, the evidence convincingly indicates the existence of a single, unified conspiracy in which all the defendants participated. Thus, all of the evidence would have been available to the jury for consideration of the government's single conspiracy claim against each defendant regardless of the possibility of multiple conspiracies.

Determining the number of conspiracies in a particular case depends on a variety of factors including the "nature, design, implementation, and logistics of the illegal activity; the participants' modus operandi; the relevant geography; and the scope of coconspirator involvement." *Boylan*, 898 F.2d at 241; *United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.), cert. denied, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989). A single conspiracy exists where the totality of the evidence demonstrates that " 'all of the alleged co-conspirators directed their efforts towards the accomplishment of a common goal or overall plan.' " *Boylan*, 898 F.2d at 242 (quoting *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir.1984)); *United States v. Bello–Pérez*, 977 F.2d 664, 667–68 (1st Cir.1992).

The conspiracy in this case consisted of a scheme to obtain financing for a condominium project by falsely representing the existence of down payments that were never made. Although some of the details and tactics changed throughout the scheme, the main objective, structure, intended victim, and modus operandi remained constant: the continuous recruitment of unit buyers to submit loan applications to Bay Loan in which the down payments were falsified in order to fraudulently avoid the bank's down payment requirement, followed by the disbursement of Bay Loan's loan proceeds to Dean Street. Defendants all worked together interdependently to further the entire scheme. Hagopian and Ward recruited buyers, Gauvin, Granoff and Reisch provided the buyers with down payment funds, Kumalae and Landman facilitated the fraudulent representation of the down payments, and Brandon coordinated the entire conspiracy. With the exception of Gauvin and Granoff, all of the defendants played essentially the same role throughout the entire operation of the conspiracy.[69] Gauvin and Granoff stopped providing down payment funds after Brandon stopped giving them their money back; however, negotiations between Brandon and the two contin-

---

69. Hagopian and Ward joined the scheme just two months after the first condominium sales.

ued until the scheme ended. Regardless, the cessation of Gauvin's and Granoff's funding did not represent the end of one conspiracy and the beginning of a second one but a snag in the ongoing operation of the single conspiracy. *See United States v. Aracri,* 968 F.2d 1512, 1522 (2d Cir.1992) (finding acrimony among participants of conspiracy consistent with single conspiracy).

Defendants' arguments for distinguishing different conspiracies have all been previously rejected and none of the factors they highlight indicates the existence of multiple conspiracies. The presence of different methods of falsifying the down payments— e.g., recycled funds, nonnegotiated checks, dischargeable mortgages—does not create separate conspiracies. *See, e.g., Aracri,* 968 F.2d at 1521–23; *United States v. Aponte-Suárez,* 905 F.2d 483, 486–88 (1st Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990); *United States v. Crosby,* 294 F.2d 928, 945 (2d Cir.1961), *cert. denied,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). This is especially true because the various methods were used interchangeably and often simultaneously in furtherance of an identical objective. Likewise, the differing relationships various defendants had with the head conspirator, Brandon, does not signify that multiple conspiracies existed. *See United States v. Bello–Pérez,* 977 F.2d 664, 668 (1st Cir.1992); *United States v. Townsend,* 924 F.2d 1385, 1389 (7th Cir.1991) ("The crime of conspiracy focuses on agreements, not groups.").[70] The fact that different defendants were involved in separate transactions for the purchase of different properties

at different motels is not significant so long as there is a single continuing plan. *See Boylan,* 898 F.2d at 242; *Drougas,* 748 F.2d at 8; *United States v. Kelley,* 849 F.2d 999, 1003 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988). Finally, the fact that Dean Street was engaged in other licit and illicit commercial enterprises does not relate to the present case against defendants and is irrelevant.

Almost all aspects of the government's case describing the scheme to defraud Bay Loan were relevant to each defendant's respective role in the conspiracy. Thus, we see no risk that the jury based a defendant's conviction on evidence relating to an unrelated offense. The lack of prejudice is underscored by the fact that ample evidence was presented against each individual defendant based on each defendant's actions and statements. *See supra* Section IV. The jury did not need to rely on evidence relating specifically to other defendants in order to convict. In addition, the judge repeatedly cautioned the jury to assess the evidence separately against each defendant.[71] *See Boylan,* 898 F.2d at 244 (finding similar instructions contributed to protecting defendant's rights).

### C. Willful Blindness Instruction

The district court instructed the jury that "in deciding whether a Defendant acted knowingly, you may infer knowledge of a fact if you find beyond a reasonable doubt that the Defendant deliberately closed his or her eyes to a fact that otherwise would have been

---

70. The present conspiracy is not, as defendants allege, the type of conspiracy discussed in *Kotteakos,* 328 U.S. at 753–55, 66 S.Ct. at 1242–43, where different conspirators had separate and independent relationships with the hub conspirator and were thus separate spokes on a rimless wheel. Here, all the defendants were part of an integrated, interdependent scheme in which each defendant depended upon and was connected to the others. The scheme could not function without a steady stream of new buyers recruited by Hagopian and Ward. New buyers were useless, however, unless they could get down payment funds provided by Gauvin, Granoff, and Reisch. In turn, down payment funds could not be properly recycled or falsified to defraud the bank unless Landman and Kumalae facilitated the transactions.

71. The district court also told the jury to determine each charge against each defendant based only on the evidence against that defendant on that charge. More significantly, the judge also cautioned the jury:

to consider only the evidence regarding that Defendant's actions or the actions of individuals belonging to a conspiracy to which that Defendant also belonged. That is to say, it would be improper to return a guilty verdict with respect to a Defendant based on evidence relating to acts committed by someone belonging to a conspiracy of which the Defendant was not a member.

obvious to that Defendant." [72] The evidence supporting this instruction related only to defendant Landman but the instruction was given generally for all defendants without any mention of Landman's name. Defendants claim the instruction was reversible error because it was not applicable to this case and because it caused the jury to convict defendants without finding sufficient evidence of knowledge beyond a reasonable doubt.

■ We find, first of all, that the instruction was appropriate and accurate as to defendant Landman; hence, no error was made in his case. The trial court may instruct the jury concerning willful blindness when a defendant claims a lack of knowledge, the facts support an inference of defendant's conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood by a juror as mandating the inference of knowledge. *United States v. St. Michael's Credit Union*, 880 F.2d 579, 584 (1st Cir.1989); *United States v. Picciandra*, 788 F.2d 39, 46 (1st Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986). More specifically, the instruction is proper when there is evidence to "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir.1991) (citing *United*

*States v. Alvarado*, 838 F.2d 311, 314 (9th Cir.1987), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988)).

■ The core of Landman's defense as argued at trial was that he was simply doing his job as an escrow agent in receiving and dispersing funds at the direction of Dean Street and that he did not know that the transactions he was involved in were illegally defrauding the bank.[73] As discussed in Section IV, sufficient evidence exists that Landman knew down payments were required. The evidence also supports the conclusion that Landman knew about the scheme to fraudulently represent the existence of down payments.[74] However, on cross-examination, the defense attempted to impeach Marderosian's testimony that he told Landman about the dischargeable second mortgages to be given to the buyers which called into question a key piece of evidence regarding Landman's knowledge. There was, nevertheless, evidence that Landman tried to avoid learning of particular buyers' use of dischargeable mortgages for their down payments. During several closings Landman was asked by buyers about the second mortgages. On one occasion, he told the buyer that he "didn't want to know anything about it." At other times, Landman gestured in a way that one buyer described as trying to say "not in front of me."

This evidence is sufficient to support the district court's willful blindness instruction.

---

**72.** The rest of the court's willful blindness instruction stated:

> In order to infer knowledge, you must find that two things have been established.
> First, that the Defendant was aware of a high probability of the fact in question.
> And second, that the Defendant consciously and deliberately avoided learning of those facts. That is to say, that the Defendant willfully made himself blind to those facts. It is entirely up to you to determine whether a Defendant deliberately closed his or her eyes to the facts and, if so, what inference, if any, should be drawn.
> However, it is important to bear in mind that mere negligence or mistake in failing to learn the facts is not sufficient. There must be a deliberate effort to remain ignorant of the facts.

**73.** Landman made this argument in various motions before the judge and before the jury which satisfies the first requirement that the defendant

claim a lack of knowledge. It is not the case, as Landman argues, that a defendant must testify or present evidence indicating a lack of knowledge before a willful blindness instruction can be deemed appropriate. *See United States v. Lizotte*, 856 F.2d 341, 343 (1st Cir.1988).

**74.** We reject the argument that proof of direct knowledge precludes a willful blindness instruction that is otherwise appropriate. As long as separate and distinct evidence supports a defendant's deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evidence of direct knowledge, a willful blindness instruction may be appropriate. *See Lizotte*, 856 F.2d at 343; *United States v. Ochoa–Fabián*, 935 F.2d 1139, 1142 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)

The attempt to avoid discussion of dischargeable mortgages with the buyers can be interpreted as a "pattern of behavior predicated upon a knowledge of the conspiracy together with a desire to limit inculpatory evidence of complicity." *United States v. Ciampaglia*, 628 F.2d 632, 643 (1st Cir.), *cert. denied*, 449 U.S. 956, 1038, 101 S.Ct. 365, 918, 66 L.Ed.2d 221, 501 (1980). The actual instructions given by the district court were proper and cannot be misunderstood as mandating an inference of knowledge. *See St. Michael's*, 880 F.2d at 585 (finding similar language proper); *United States v. Ochoa–Fabián*, 935 F.2d 1139 (10th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992) (same); *United States v. Hiland*, 909 F.2d 1114, 1130 (8th Cir.1990) (same). Significantly, the court said the jury "*may* infer knowledge" (emphasis added) and that it was "entirely up to" the jury to find deliberate blindness. *See Ciampaglia*, 628 F.2d at 642.[75]

■ Unlike the case against Landman, the evidence did not warrant a willful blindness instruction for the other seven defendants. This left the trial judge with a difficult decision. He could either, (1) give no willful blindness instruction even though it was warranted; (2) give the instruction only for defendant Landman and thus highlight the evidence against him; or (3) give a general instruction for all the defendants. We do not think the judge erred by choosing the third option.

Assigning error to the district court's decision to give the general instruction puts the court in an impossible position because the government is entitled to the willful blindness instruction as to Landman and the judge is entitled in turn to give an instruction that would not turn the spotlight on a single defendant. On the facts of this case, we are satisfied that the jury could be expected to apply the instruction properly to defendants whose conduct arguably calls for that application and not randomly or recklessly to defendants who do not deserve the instruction. It is common during multi-defendant trials for the court to give a number of boilerplate instructions—concerning, for example, a missing witnesses, accomplice liability, or withdrawal from the conspiracy—that are pertinent, on particular facts, to only one defendant and not to the others. The instruction in this case is similar in many respects to these other instructions and is equally appropriate given the risk of prejudice to the other defendants is low. We do not exclude the possibility that, on particular facts, it might so mislead a jury to give a general instruction, rather than one tailored to a specific defendant or rather than no instruction at all, as to be an abuse of discretion, but we emphasize that judgments of this kind are primarily entrusted in the trial judge who inevitably has a superior feel for the dynamics of the trial and the likely reaction of the jury.

The danger of an improper willful blindness instruction is "'the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place.'" *United States v. Littlefield*, 840 F.2d 143, 148 n. 3 (1st Cir.), *cert. denied*, 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988) (quoting *United States v. White*, 794 F.2d 367, 371 (8th Cir.1986)) (additional citation omitted). In this case, as in *Littlefield*, 840 F.2d at 147–48, the willful blindness instruction clearly had little, if any, effect on the jury's verdict. First of all, unlike those cases where insufficient facts were present to support any willful blindness instruction at all, *see, e.g., United States v. Barnhart*, 979 F.2d 647, 651–53 (8th Cir.1992); *United States v.*

---

**75.** The holding in *United States v. Mankani*, 738 F.2d 538, 547 & n. 1 (2d Cir.1984) does not apply in this case. First of all, at most, *Mankani* stands for the specific proposition that a "conscious avoidance" instruction cannot be used to establish membership in a conspiracy and not the more general proposition that the instruction is never proper in a conspiracy case. The willful blindness instruction in this case had to do with the finding that "defendant acted knowingly" and not with a finding that defendant willfully joined the conspiracy. In any event, to the extent our holding in this case differs from that in *Mankani*, we agree with the Seventh Circuit that a willful blindness instruction can be permissible with respect to a conspiracy charge. *United States v. Díaz*, 864 F.2d 544, 549 (7th Cir.1988), *cert. denied*, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989) (citing *United States v. Kehm*, 799 F.2d 354, 362 (7th Cir.1986)).

*Alvarado,* 838 F.2d 311, 316 (9th Cir.1987), *cert. denied,* 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988), this case involved an instruction that was proper for at least one defendant. The jury had an opportunity to correctly apply the instruction and was less likely to improperly consider a defendant's willful blindness in conjunction with facts that only supported that defendant's direct knowledge, or complete lack of knowledge. Thus, there was little risk that the jury was confused into convicting a defendant who merely should have known about the criminal venture. *See United States v. Díaz,* 864 F.2d 544, 551 (7th Cir.1988); *see also Rivera,* 944 F.2d at 1570–71.

In addition, the instructions properly and clearly directed the jury not to find knowledge based on mere negligence and extensively instructed the jury as to the requirements for finding knowing participation in the conspiracy and knowing execution of bank fraud. *See Littlefield,* 840 F.2d at 147–48; *Díaz,* 864 F.2d at 551. The court instructed the jury that "mere negligence or mistake in failing to learn the facts is not sufficient" and that a defendant's willful ignorance had to be deliberate beyond a reasonable doubt. Throughout the instructions, the court told the jury that the government had to prove each and every element of the offenses, including those elements requiring knowledge, beyond a reasonable doubt. For example, knowing participation in the scheme to defraud required the actions of each defendant to be "done voluntarily and intentionally and not because of mistake or accident or some other innocent reason." The court was clear that to prove participation in a conspiracy, the government must show that a "defendant knew of the existence of the conspiracy and its unlawful purpose" and the court added that "knowledge and willfulness like all of the other elements of a crime must be established beyond a reasonable doubt." Twice the district court explained that actual proof of knowledge was essential "to insure that no one will be convicted for an act that he or she did not intend to commit or the nature of which he or she did not understand."

The instructions, taken as a whole, went a long way toward curing any possible prejudice that may have resulted from the willful blindness instruction. As evidence of this, the jury delivered verdicts that demonstrated it was not confused or affected by the willful blindness instruction. Three defendants were acquitted on multiple bank fraud counts and a fourth was acquitted on one count of bank fraud. Defendant Landman was acquitted on one count in which the principal witness testified that Landman did not want to know about the second mortgage discharges. Thus, it appears that the jury declined to apply the willful blindness instruction when it was given the first clear opportunity to do so. We therefore find no error in the court's decision to give a general willful blindness instruction.

## X. REHEARING OF TESTIMONY BY THE JURY

Defendant Gauvin assigns error to the district court's failure to read back certain testimony to the jury in response to the jury's request. Four days into the jury's deliberations, the jury asked to rehear several areas of testimony. One jury request stated: "We would also like to review the testimony of Mr. Marderosian concerning a meeting in which Mr. Gauvin, Mr. Granoff and Mr. Brandon discussed the purchase of Pidge and Meeting Street." As several references were made to Pidge and Meeting Street it was not clear which discussion the jury was referring to. The court and the attorneys spent nearly two days trying to cull together the parts of the transcript that related to all of the requested subject matter. At one point, the court suggested, and the prosecutor later argued, that the entire transcript of Marderosian's testimony should be provided to the jury, but counsel for Granoff objected to this suggestion.

The court read to the jury a portion of Marderosian's testimony relating to Pidge and Meeting Street and to a meeting where the Pidge project was discussed. Against the objection of Gauvin's counsel, the court stopped reading the transcript just before testimony concerning additional meetings relating to the same deal as the one involving

Pidge and Meeting Street but not specifically mentioning Pidge or Meeting Street. We find no abuse of discretion in the trial judge's decision not to read additional portions of the transcript.

█ The decision to reread testimony rests entirely upon the trial court's sound discretion. *United States v. Akitoye*, 923 F.2d 221, 226 (1st Cir.1991); *United States v. Argentine*, 814 F.2d 783, 787 (1st Cir.1987) (citing *United States v. Almonte*, 594 F.2d 261, 265 (1st Cir.1979)). The exercise of that discretion should not be disturbed absent good reason. *Argentine*, 814 F.2d at 787.

█ In this case, the trial judge, with advice of counsel, reviewed the record for two days in order to locate material responsive to the jury's request. Faced with a request for testimony relating to a meeting discussing "Pidge and Meeting Street" and faced with multiple references to Pidge and Meeting Street in the record, the judge decided to read testimony concerning a meeting where Pidge was mentioned but not to read testimony relating to a subsequent meeting in which Pidge and Meeting Street were not mentioned. We find this decision to be appropriately within the judge's discretion.

The fact that the omitted testimony concerned the same deal as the one involving Pidge and Meeting Street and the fact that it also contained some discussion of down payment arrangements does not suggest any abuse of discretion. First of all, to the extent the omitted testimony is crucial to Gauvin's defense, as he claims, we find the testimony to be more inculpatory in nature than

exculpatory.[76] More importantly, the judge was attempting to respond appropriately to a jury request that turned out to be far from narrowly focussed. *See Akitoye*, 923 F.2d at 226. The extra burdens on the court created by rehearing testimony is relevant to judging the reasonableness of the court's refusal to read back testimony to the jury. *See id.* If the trial judge had searched for all the testimony related to the deal involving Pidge and Meeting Street or all the discussions of down payment arrangements for that deal, the judge would have had to spend considerably more time and effort than he had already expended. Such extra effort was not required.

## XI. REFUSAL TO APPOINT PARALEGAL FOR BRANDON

Defendant Brandon alleges that the trial court's denial of his request for a court-appointed paralegal denied him his due process right to present a defense. Prior to the indictment, the Federal Bureau of Investigation took possession of 137 file boxes from Dean Street's offices which contained documents kept by Dean Street. Although Brandon was given complete access to the files, he claims that without the services of a paralegal he and his court-appointed attorney were incapable of meaningfully examining the contents of the files, effectively denying him access to potentially exculpatory evidence. Brandon and his attorney did spend four hours one afternoon examining the contents of three of the file boxes.

76. The omitted testimony included the following:
A. Mr. Brandon explained to Mr. Gauvin and Mr. Granoff that Homeowners required a twenty-five percent down payment and while that down payment would not be required of Mr. Gauvin and Mr. Granoff, he did have the problem of the down payment with subsequent purchasers and he asked Mr. Gauvin and Mr. Granoff for their assistance in meeting that problem.
Q. What, if anything did Mr. Gauvin respond?
A. Mr. Gauvin, as I recall, initially, didn't quite understand what Mr. Brandon wanted and after further explanation, Mr. Gauvin responded that he might be interested under some circumstances in helping out.
Q. What about Mr. Granoff?

A. I believe Mr. Granoff indicated his consent also.
Defendant Gauvin claims this testimony was crucial to his defense because it corrects a mischaracterization in the government's closing argument about what Marderosian said about the down payments. Defense counsel explicitly told the jury to review the testimony regarding the alleged mischaracterization. We have some doubts, given the request for a meeting concerning "Pidge and Meeting Streets," that this particular request was related to the issue of the alleged mischaracterization. In any event, we find no abuse of discretion in the judge's decision that the omitted material was not what the jury was looking for.

Defendant cites *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny for the proposition that his due process rights were violated. *Brady* requires the government to disclose any exculpatory evidence that is "material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197. Before we even reach the issue of whether the lack of paralegal services effectively constituted a failure of the government to disclose evidence, we must first consider whether the defendant established that the file boxes contained potentially exculpatory, or even material, evidence in the first place.

 To establish a violation of *Brady,* a defendant must provide the court with some indication that the materials to which he or she needs access contain material and potentially exculpatory evidence. *See United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *cf. United States v. Mateos–Sánchez,* 864 F.2d 232, 240 (1st Cir.1988) (holding that a Criminal Justice Act rule, 18 U.S.C. § 3006A(e)(1), which provides for the provision to defendants of necessary investigative or other services, requires a defendant to make at least some showing why the requested assistance would produce evidence "likely to be pivotal to his defense"). In his initial request before the trial court and subsequently on appeal, the defendant speculated that the Dean Street files might contain exculpatory evidence. Brandon never presented, however, any supporting evidence or arguments to indicate this was, in fact, the case. Because Brandon did not make any showing at all as to the nature of the disputed materials, we find no error in the court's refusal to appoint a paralegal for Brandon's defense.

This is not a Catch–22 situation in which defendant cannot make the initial showing needed to get a paralegal without first having a paralegal to assist in making the initial showing. Instead, the defendant can establish the possible existence of material and exculpatory evidence by, at the very least, describing the kinds of documents that might be in files which, if they were found, might exculpate the defendant.[77] At most, defendant and counsel could have spent a few more afternoons looking in the files for representative samples of documents that might be useful to the defense. We do not think this places too much of a burden on defendant or defendant's counsel.

## XII. CUMULATIVE EFFECT OF ERRORS

Defendants argue that the cumulative effect of numerous alleged errors made before and during the trial deprived them of a fair trial and enabled the jury to convict despite the lack of evidence against each individual defendant. Our review of the record and trial proceedings as a whole does not reveal pervasive unfairness or any error or combination of errors that deprived the defendants of due process. *See United States v. Barnett,* 989 F.2d 546, 560 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993); *United States v. Steffen,* 641 F.2d 591, 598 (8th Cir.), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981). We thus conclude that defendants received a fair trial.

## XIII. SENTENCING

### A. Amount of Loss and Relevant Conduct

Defendants attack the district court's determination and apportionment of Bay Loan's losses for the purpose of calculating their sentences under the Sentencing Guidelines.[78] The district court set the offense level for each defendant based on the actual loss to Bay Loan resulting from the scheme

---

**77.** Brandon posits in his brief that the files may have contained a letter from Bay Loan acknowledging that no down payments were required. This example was not pointed out to the trial judge. Even if the example was presented at trial, however, it would probably not, by itself, be sufficient to establish the existence of material exculpatory evidence without some additional substantiation. Defendant made no claim as to the probability such a letter exists nor provided an affidavit that he received such correspondence.

**78.** The district court applied the 1988 version of the Sentencing Guidelines and therefore all citations, unless otherwise indicated, are to that version.

to defraud. *See* U.S.S.G. § 2F1.1; *United States v. Haggert*, 980 F.2d 8, 11–12 (1st Cir.1992). The court arrived at a figure of $11.4 million by reducing the outstanding principal amount of the fraudulently obtained end loans by, among other things, the value of the collateral used to secure them. The court then included the entire amount of the loss in the calculation of each defendant's offense level under § 2F1.1. The resulting total offense level was set by adding an 11-level increase to the base offense level because the total loss was over $5,000,000, the highest point on the loss scale at that time. U.S.S.G. § 2F1.1(b)(1).

The defendants first challenge the district court's valuation of the collateral used to secure the loans. We review the valuation for clear error. *United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992). Determination of actual loss need not be precise; "[t]he court need only make a reasonable estimate of the range of loss, given the available information." U.S.S.G. § 2F1.1 comment note 8.

The court determined the value of the collateral used to secure the loan after an evidentiary hearing with respect to the amount of loss. At this hearing, the court heard testimony by Bay Loan's president and a real estate appraiser called by the defense. The court also reviewed exhibits containing information on the value of each of the motel condominiums. Defendants argue that the $2.7 million dollar figure chosen by the court as the total value of the collateral (the motels) was improperly based on a 1991 appraisal as opposed to an earlier 1989 appraisal for $7.8 million. Defendant seems to argue that the earlier appraisal is the more accurate one because it was made closer to the time of the crime and because the latter appraisal is more likely to be affected by causes not related to the actions of defendants. Given the evidentiary basis—a pro-

fessionally prepared appraisal—for the trial court's determination of loss, however, we do not see any error, let alone clear error, in the court's decision to choose the lower valuation of the collateral.

A more significant objection raised by many of the defendants is that the court improperly assigned to each of them the entire value of the loss regardless of their degree of participation in the scheme to defraud Bay Loan. The Guidelines provide that for conspiracy convictions, relevant conduct "includes conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3(a)(1) comment note 1; *see also United States v. O'Campo*, 973 F.2d 1015, 1023 (1st Cir.1992). This language has been subsequently clarified to state that relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B), 1993 Guidelines. The clarification was designed to highlight the distinction between the scope of criminal liability and the scope of sentencing accountability. Regardless, "[t]he central concept then is foreseeability." *O'Campo*, 973 F.2d at 1023.

There is first the question in this case of whether the district court applied the correct standard of foreseeability. Defendants argue that instead of limiting the determination of losses that each individual defendant could foresee solely to those losses connected with the criminal activity that a particular defendant agreed to jointly undertake,[79] the court simply held all the defendants responsible for all the losses attributable to the entire scope of the conspiracy. *See, e.g., United States v. Lanni*, 970 F.2d 1092 (2d Cir.1992). While it is true that the criminal venture a defendant intended to join is not necessarily the same as the scope of the entire conspiracy, U.S.S.G. § 1B1.3 comment note 2, 1993

**79.** The 1993 Guidelines define, in a rather unilluminating fashion, "criminal activity the particular defendant agreed to jointly undertake" as "the scope of the specific conduct and objectives embraced by the defendant's agreement." U.S.S.G. § 1B1.3 comment note 2, 1993 Guidelines. The Guidelines go on to point out that "the criminal activity that the defendant agreed

to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical." *Id.* In other words, one can reasonably foresee conduct in furtherance of an agreed upon enterprise even though one did not specifically agree to join in that particular conduct. *Id.*

Guidelines, there is no reason why a defendant cannot intend to join and thus foresee the operation of the entire conspiracy. As the Guidelines acknowledge, the two can be coterminous, although "not necessarily" so.

In this case, the district court did find the scope of the conspiracy and the scope of the foreseeable conduct in furtherance of each defendant's jointly undertaken criminal activity to be the same. The judge held the defendants responsible for "acts of co-conspirators to the extent that those acts were committed in furtherance of the conspiracy and were known to or reasonably foreseeable by the Defendant." The judge then recited all the actions taken by each defendant which indicated they were involved in the entire breadth of the conspiracy.[80] Most telling is the judge's statement during sentencing that "the agreement that each [defendant] entered into was to participate in a continuing scheme to obtain loans from Bay Loan by means of fraudulent misrepresentations." Although the sentencing judge did not employ all the expository language recently added to the Guidelines, it is evident from the record that he conducted the proper analysis. We thus see no error in the district court's application of the Guidelines.

Several defendants contend that some portion of the loss was not foreseeable to them because of their limited participation in the scheme. Each claims the court should have reduced by some unspecified amount the loss attributable to him or her as relevant conduct. The determination of what a defendant can foresee for the purposes of determining relevant conduct at sentencing is inherently fact-bound and, consequently, reviewable only for clear error. *United States v. Innamorati*, 996 F.2d 456, 489 (1st Cir. 1993).

All the defendants, except Hagopian, Ward and Kumalae, were involved in the scheme to defraud Bay Loan from the very beginning. Before the scheme was first executed, Brandon discussed with Reisch methods to avoid making down payments on the end loans. The first unit sales were made to Gauvin and Granoff with Landman acting as escrow agent. The involvement of these defendants continued throughout the scheme and we find no clearly discernable limits to the scope of the criminal venture in which they agreed to participate such that the district court erred in finding all the losses from the entire conspiracy to be foreseeable. The fact that Gauvin and Granoff stopped lending down payment funds after February of 1988 does not absolve them of responsibility for the continued actions of the conspiracy to obtain more loans from Bay Loan. The issue is not whether the two continued to commit acts in furtherance of the scheme but whether, at the time of the relevant conduct, they reasonably could have foreseen the actions of the other members of the conspiracy. The evidence, particularly the ongoing correspondence with Brandon made until the end of the scheme, clearly indicates that Gauvin and Granoff not only could foresee the continued sale of condominium units, they actually knew about it.[81]

We have recently held that a defendant's base offense level cannot be based on knowledge of historic facts. *O'Campo*, 973 F.2d at 1022–26. Thus, with respect to Hagopian, Ward and Kumalae, losses attributable to

---

80. This is not a case where the sentencing court merely found that the defendant "knew what was going on." *See O'Campo*, 973 F.2d at 1025. The judge in this case recounted specific facts regarding each individual defendant which indicated that each defendant embraced the full scope of the scheme to defraud Bay Loan. *See id.* at 1025–26 n. 11.

81. We disagree with Gauvin and Granoff that the evidence clearly indicates some kind of withdrawal from the conspiracy so that the scope of the criminal venture in which they participated was limited to something less than the entire conspiracy. The trial judge carefully considered this issue and we see no clear error in his rejection of their arguments.

Similar arguments are made by Hagopian, Ward and Reisch to the effect that they were not responsible for sales arranged by other brokers or funded by other people. These arguments are unavailing. The defendants agreed to participate in the entire operation, even though their individual role may have been limited to a specific function within the broader scheme. Consequently, only a showing of the foreseeability of the other co-conspirators' conduct is required to find that conduct relevant for sentencing purposes. That standard, as the sentencing judge correctly found, was clearly met.

fraudulent activity that occurred before they became involved in the conspiracy cannot be considered as relevant conduct. *See id.* The judge's error [82] in this regard, however, had no effect on their sentences so we find no reason for reversal on this issue.

Hagopian and Ward did not become involved in the conspiracy until after October of 1987, after all of the Charlestown units had already been sold. Kumalae did not join until after some units had already been sold at the Bayside, the second motel involved in the scheme. It may well be arguable that the total *losses* to Bay Loan resulted from conduct occurring after the participation of these three defendants. When Hagopian, Ward and Kumalae joined the conspiracy, payments were being made on the end loans. It was not until the scheme to defraud expanded to more and more condominium units that it began to collapse under its own weight as additional loan funds from Bay Loan were required to pay off the existing obligations. The conduct of Hagopian, Ward and Kumalae, therefore, contributed to the overall losses to Bay Loan which took place when the loans defaulted.

More importantly, however, even if the losses resulting from the loans made for the Charlestown and Bayside units are excluded from the loss calculation for Hagopian, Ward and Kumalae, the total would still be well over $5 million, the highest level under the 1988 version of U.S.S.G. § 2F1.1. A lion's share of the loans were made for units in the five other motels after all the defendants had joined the conspiracy. Therefore, any error

in apportioning losses was harmless because it did not affect the offense level assigned to each defendant.[83]

### B. Upward Adjustments for More Than Minimal Planning

Defendants Granoff, Ward and Landman argue that the district court committed clear error by imposing a two-level increase in their offense levels, pursuant to U.S.S.G. § 2F1.1(b)(2)(A), for more than minimal planning.[84] "More than minimal planning" is defined as:

> [M]ore planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense.

> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

U.S.S.G. § 1B1.1, comment note 1(f).

 We review the district court's minimal planning assessment only for clear error. *United States v. Beauchamp*, 986 F.2d 1, 5 (1st Cir.1993). We are not inclined to reverse a finding of more than minimal planning unless the evidence compels the conclusion that defendant's actions were purely opportune or "spur of the moment." *Gregorio*, 956 F.2d at 343; *United States v. Fox*, 889 F.2d 357, 361 (1st Cir.1989) ("We cannot conceive of how obtaining even one

---

**82.** We note that, to the district judge's credit, the *O'Campo* decision settling this issue was not handed down until after the judge conducted the sentencing of the defendants in this case.

**83.** We also find no error in the district court's refusal to take into account multiple causes for Bay Loan's losses in determining the sentences. "'[T]he victim loss table in U.S.S.G. § 2F1.1(b)(1) presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court.'" *United States v. Shattuck*, 961 F.2d 1012, 1016 (1st Cir.1992) (quoting *United States v. Gregorio*, 956 F.2d 341, 347 (1st Cir.1992)). The Guidelines treat multiple causation only as a possible ground for downward departure—a matter within the sound discretion

of the sentencing court. *Shattuck*, 961 F.2d at 1017; *Gregorio*, 956 F.2d at 346–48. In this case, the sentencing court, upon extensive consideration of the issue, declined to grant such a departure. None of the factors that defendants point to as allegedly contributing to Bay Loan's losses are so compelling as to convince us that the court erred in reaching its decision.

**84.** To the extent defendant Gauvin also appeals this decision by reference in his brief to arguments made by the other defendants we find no error. As there is no error with regard to defendant Granoff, there can also be no error for Gauvin whose involvement in the scheme was greater than Granoff's. The same applies to defendant Hagopian whose involvement was greater than defendant Ward's.

fraudulent loan would not require more than minimal planning.").

In light of the rather complex and sophisticated scheme involved in this case, we find any assignment of error to the sentencing judge's ruling that the defendants engaged in more than minimal planning to be rather far-fetched. In any event, the judge made more than adequate findings based on the record to support his decision. The judge found that Ward took the initiative to find buyers for the scheme and helped falsify down payments which constituted "repeated acts" over a period of time. Ward protests that there is no evidence that he "initiated" any of the contacts with the buyers. This is mere quibbling. Ward was actively involved in the recruitment process, he told buyers no down payments were required, he told buyers to provide down payments checks that he knew would not be negotiated, and he provided buyers with rebates for their purchases. Any one of these facts would support a finding of more than minimal planning.

As for defendant Granoff, the district court found that the scheme to defraud Bay Loan involved more planning than is typical for commission of the offense in its simple form. Looking at the scheme as a whole, this fact is indisputable. But this fact is also true when viewed from the perspective of Granoff's specific involvement. Granoff first met with Brandon in the summer of 1987 to discuss the condominium project and eventually he agreed to purchase some units and to fund buyer down payments. Pursuant to this agreement, Granoff purchased four units in August of 1987 in which funds were recycled via a sophisticated arrangement. Five months later, he provided $470,000 to Dean Street on the understanding it would be returned to him after it was used to fund buyers' down payments. Granoff also formed a partnership with Gauvin to invest in the Dean Street project. All of these activities reflect a significant level of involvement in the scheme. We therefore find no error in his case.

Finally, the sentencing judge found that Landman engaged in "repeated acts" during the scheme in his role as escrow agent or closing attorney for most of the loan transactions. There is no basis for any error in his case.

## C. Denial of Role–In–The–Offense Decrease for Marvin Granoff

Defendant Granoff claims the court erred in finding he was not a minor participant and thus not entitled to a decrease in his offense level pursuant to U.S.S.G. § 3B1.2(b). "[A] minor participant means any participant who is less culpable than most other participants." U.S.S.G. § 3B1.2(b) comment note 3, 1993 Guidelines. No defendant, however, is automatically entitled to a reduction, even if the defendant happens to be less culpable than his or her co-defendants. *United States v. Valencia-Lucena,* 925 F.2d 506, 514 (1st Cir.1991); *United States v. Rexford,* 903 F.2d 1280, 1282 (9th Cir.1990). The sentencing court has broad discretion in determining whether this downward departure is appropriate and we will reverse only if the evidence overwhelmingly demonstrates that the defendant played a part that makes him substantially less culpable than the average participant in the convicted offense such that the court's decision was clearly erroneous. *Gregorio,* 956 F.2d at 344; *United States v. Ocasio,* 914 F.2d 330, 333 (1st Cir.1990).

Although the district court found that Granoff was less culpable than the major participants in the scheme like Brandon, the court found that Granoff did play more than a minor role. The $470,000 Granoff provided to fund buyer down payments was a significant contribution to the scheme to defraud Bay Loan. We find that the record supports the court's finding that Granoff was not less culpable than most of the other defendants let alone substantially less culpable than an average defendant and we therefore affirm Granoff's sentence.[85]

---

**85.** Granoff also claims that the district court erroneously failed to depart downward based on his age and physical condition, pursuant to U.S.S.G. § 5H1.1 and § 5H1.4. This issue is not properly before the court because defendant did not seek a downward departure on this basis during sentencing. *See United States v. Slade,* 980 F.2d 27, 30 (1st Cir.1992). The issue of age

### D. Costs of Supervised Release and Special Assessments

The government correctly concedes that our decision in *United States v. Corral,* 964 F.2d 83, 84 (1st Cir.1992) mandates that we find erroneous the court's decision to impose costs of supervised release on five defendants found to be indigent for purposes of a punitive fine. We therefore reverse the imposition of supervised release costs on defendants Brandon, Ward, Landman, Hagopian, and Kumalae.

 Brandon further argues that because he is indigent, the district court was without authority to order him to pay either restitution or the statutory assessments. In imposing an order of restitution, the district court must consider not only the amount of the victim's loss but also "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a); *United States v. Savoie,* 985 F.2d 612, 618 (1st Cir.1993).

 In this case, the sentencing judge considered the required factors and, without error, arrived at the conclusion that a $500,-000 restitution order, payable after the three year period of supervised release, was appropriate. Specifically, the judge stated: "[I]n arriving at that figure, Mr. Brandon, I recognize that based on the pre-sentence report, you don't appear to have any assets at the present time but it appears that you have the prospect of receiving or inheriting some assets in the future." The court also noted that a man of Brandon's talents ought to be able to obtain gainful employment upon release.

 Although the restitution order may be burdensome, and although it may be true to some extent that "if a defendant is indigent for purposes of one [fine], he must be indigent for purposes of the other." *United States v. Labat* 915 F.2d 603, 607 (10th Cir. 1990), we do not think *Corral*'s ban on imposing certain fines on indigent defendants extends to restitution orders. *Corral* dealt specifically with the interplay of two provisions of the United States Sentencing Guidelines, U.S.S.G. § 5E1.2(a) and § 5E1.2(i). *Corral,* 964 F.2d at 84. We found in that case that because the fine imposed under § 5E1.2(i) was an additional fine to be instituted only in conjunction with the punitive fine imposed under § 5E1.2(a), the former could not be imposed once the latter was waived because of defendant's indigency. *Id.* In the case of restitution, however, a separate statutory scheme has been established which includes its own independent consideration of defendant's ability to pay. 18 U.S.C. § 3664. Therefore, the district court's determination of indigency under U.S.S.G. § 5E1.2(a) in the present case is independent of and does not affect its ruling on restitution.[86]

*The judgments are affirmed except that the judgment of conviction of defendant Ward on Counts 24 and 25 and the judgment of conviction of defendant Landman on Counts 23 through 26 are vacated and their cases are remanded for resentencing. The district court's imposition of costs for supervised release are vacated for defendants Brandon, Landman, Hagopian, Ward and Kumalae.*

and health were raised only with respect to the range of the sentence and to bail pending appeal. Thus, the issue of departure based on age and physical condition was not preserved for appeal.

**86.** To the extent Brandon also challenges the $50 statutory assessment fee imposed for each count (totaling $1300) by the district court pursuant to 18 U.S.C. § 3013, we find no error. The assessment fee is mandatory; the judge has no discretion to waive it based on the defendant's ability to pay nor does the Constitution require him to do so. *United States v. Nguyen,* 916 F.2d 1016, 1020 (5th Cir.1990); *United States v. Rivera-Vélez,* 839 F.2d 8 (1st Cir.1988).